UNITED STATES of America,
Plaintiff–Appellee,

v.

Harvey L. HOOVER, Defendant–
Appellant.

No. 98–2992.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1999.

Decided April 28, 1999.

Jon E. DeGuilio, Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee.

Joseph F. Rubin (argued), Mishawaka, IN, for Defendant–Appellant.

Before POSNER, Chief Judge, FLAUM, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

Defendant Harvey Hoover appeals from the sentence he received after a jury found him guilty of three counts of filing false income tax returns in violation of 26 U.S.C. § 7206 and one count of presenting a false statement on a college financial aid application in violation of 18 U.S.C. § 1001. For the reasons stated herein, we modify the district court's restitution order to the extent that it applies to Hoover's tax liability, but we affirm on all other grounds.

## I. BACKGROUND

Harvey Hoover ("Hoover") was a dairy farmer in Wabash County, Indiana. His sons, Michael, born in 1962, and Tadd, born in 1973, helped him run the large family farm. He did not pay his sons a salary, but gave them spending money as they needed it. The Hoover farm consisted of sixty milk cows and 300 acres on which corn, beans and hay were grown. In addition to his dairy business, Hoover sold calves and grain. Hoover did not keep many business records; according to his sons, he merely kept track of "some things" by handwritten notes on scraps of paper.

Hoover and his wife, Judith, became enmeshed in bitter divorce proceedings beginning in 1989. As a result of the divorce decree, Judith was granted judgments against certain assets of the farm. In the process of executing against these judgments, Hoover's tax and dairy records were subpoenaed. This turned out to be the beginning of a federal investigation which later resulted in the charges against Hoover.

Hoover was obsessed with saving the farm from coming into his former wife's possession. Apparently, he was equally obsessed with protecting his money from the IRS. Hoover hid his money in a number of ways. He frequently put property and bank accounts in the names of other people, usually his sons. He instructed creditors to write checks made out to his sons, but kept all the proceeds for himself. Sometimes Hoover told his sons to endorse checks made out to them, sometimes he signed his sons' names himself. He set up bank accounts in his sons' names, listing them as father and son and giving his older son, Michael, a birth date of March 9, 1916. He set up an account in Tadd's name, showing Tadd's birthday as September 9, 1938, Hoover's own birthday. Though he hid his money in other, equally creative ways, it is not necessary to go into them all in this opinion. Suffice it to say that, after all of his maneuvering, Hoover had unreported income of $192,234 in 1990, $152,820 in 1991 and $141,577 in 1992.

Additionally, in 1992, Hoover signed and submitted an application for student loans for Tadd, a student at Purdue University, stating that he (Hoover) had no income in 1991. Hoover also stated on the application that he did not file an income tax return in 1991 and that he had assets of only $13.00. Based on these representations, Tadd received over $7,000 in financial aid from Purdue that year.

Hoover was charged and tried for one count of conspiracy to defraud the government, one count of filing a false statement on a college financial aid application, and three counts of filing false income tax returns. He was acquitted of the conspiracy count, but was convicted by a jury of filing false tax returns and of presenting a false statement to Purdue University. Following the return of verdicts, the court ordered that Hoover, "pending further order of the court, not cash, negotiate or transfer any United States savings bonds, period." On July 24, 1998, the court sentenced Hoover to 46 month imprisonment. As part of the sentence, the court ordered Hoover to turn over to the United States government, by August 7, 1998, title to 304 savings bonds in the names of Michael and Tadd Hoover. Each bond had a face value of $1000 and the total was to be applied to (1) the expenditures under the Criminal Justice Act for Hoover's attorney, his expert witness and the costs of prosecution, (2) Purdue University in the sum of $13,543, and (3) the IRS for application to Hoover's tax liability.

Hoover filed a notice of appeal on August 3, 1998. On September 18, 1998, the court held a hearing at which it found Hoover in contempt of its order to turn over the 304 savings bonds because Hoover placed 150 of the savings bonds in his son Michael's possession. As a result, the court sentenced Hoover to six additional months imprisonment.

## II. ANALYSIS

Hoover raises four issues on appeal. First, he challenges the district court's use of a rate of 28% of unreported income as a basis for computing tax loss for purposes of the sentencing guidelines. Second, the defendant argues that the district court acted without legal authority when it ordered him to turn over savings bonds that were in his sons' names. Third, Hoover claims that the district court abused its discretion when it held him in contempt and sentenced him to an additional six months in prison for physically placing savings bonds in his son's possession after the court ordered him not to transfer the bonds. Finally, Hoover argues that the evidence was insufficient to establish the necessary element of wilfulness under 18 U.S.C. § 1001 and 26 U.S.C. § 7206(1).

### 1. 28% tax rate.

 Hoover's first claim on appeal is that the district court erred in determining the tax loss to the government as 28% of his unreported income, instead of a lower tax rate proposed by his expert. We will uphold a sentence if the guidelines were

properly applied to factual conclusions that were not clearly erroneous. *United States v. Vopravil*, 891 F.2d 155, 157 (7th Cir. 1989). Thus, questions of fact are reviewed for clear error. *United States v. Song*, 934 F.2d 105, 109 (7th Cir.1991).

The sentencing guideline applicable to Hoover's tax convictions, USSG § 2T1.1(c)(1)(A), provides:

> (A) If the offense involved filing a tax return in which gross income was under-reported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made.

Hoover argues that the district court erred in applying the 28% rate because he presented evidence, through his accounting expert, Brent Dawes, that a more accurate determination of tax loss could be made.

In calculating his tax loss figure, Dawes looked at the three years of conviction: 1990, 1991 and 1992. He did not examine Hoover's actual expenses during those years, because Hoover had no records for those years. Instead, Dawes looked at the expenses of some of his own agricultural clients, a Purdue University Livestock Production Budget, and Hoover's canceled check stubs from 1988.

The district court rejected Dawes' methodology as flawed for two reasons. First, the court noted that Dawes' methods asked the court to offset assumed expenses and deductions against known unreported income where the assumptions were required solely because of Hoover's failure to keep records. Second, the court concluded that it was not reasonable to use the Purdue Livestock Budget because it was based on expenses incurred by an average dairy farmer. Hoover, the court determined, was far from an average dairy farmer—his farm and his profits were significantly larger than the average dairy farm included in the Purdue report.

The government points to additional ways in which Dawes' methodology was flawed. For example, Dawes relied on 1988 check stubs because Hoover told him 1988 was a representative year for the dairy farm. However, the evidence presented at trial showed that 1988 was a drought year, so presumably Hoover had less income and more expenses than usual. Thus, 1988 was not a representative year. Also, Dawes could not be certain that the check stubs used in his tax rate calculation actually represented farm expenses, as opposed to investment purchases. For instance, Hoover maintained a commodity futures trading account. "Iowa Grain" was the name of the clearing firm for the trading account. Thus, a canceled check to the grain company could have represented the purchase of a trading commodity rather than an actual expense for the purchase of grain.

The sentencing guidelines instruct the district court to use the statutory rate unless a more accurate rate of tax loss can be determined. It is clear that the calculations going into the tax rate proposed by Hoover's expert were no more accurate than the guidelines' rate and, as the district court observed, using the defendant's numbers would be just as arbitrary as the 28% figure used in the sentencing guidelines. Hence, it was not clearly erroneous for the district court to apply the presumed rate of tax loss, especially in light of the fact that the defendant's activity in not keeping records was the reason preventing a more accurate figure from being ascertained.

**2. Savings bonds.**

 Hoover argues that the district court acted contrary to law when it ordered him to surrender savings bonds that were in his sons' names to satisfy an order of restitution. Because Hoover raises a legal challenge to the restitution order, our review is de novo. *United States v. Lampien*, 89 F.3d 1316, 1319–20 (7th Cir.1996).

Hoover's primary argument is that the district court lacked legal authority to make the restitution order. As an initial matter, the government concedes, and we agree, that the district court exceeded its authority to the extent that it ordered Hoover to surrender the bonds to pay his tax liability. This court held in *United States v. Minneman*, 143 F.3d 274, 284 (7th Cir.1998), that the Victim and Witness Protection Act (the "VWPA") does not authorize restitution for Title 26 tax offenses. Thus, because the district court did not have authority to order the payment on the tax liability, Hoover is entitled to modification of the restitution order in that respect.

■ As to the order of restitution to Purdue and reimbursement for the costs of court-appointed counsel, Hoover argues that nothing in the VWPA grants the district court the authority to make this order and, absent express authority, the district court is powerless to act. Hoover relies on *United States v. Lampien*, in which this court held that an order of restitution requiring a defendant to quitclaim her house to her victim exceeded the district court's authority under the restitution provision of the VWPA. 89 F.3d at 1322. We held that "a district court is limited to effecting the enforcement of a restitution order only as expressly provided by the VWPA." *Id.* At the time of that decision, the VWPA did not expressly authorize a court order authorizing a quitclaim deed. *Id.* However, *Lampien* was decided in 1996, before Congress passed the Mandatory Victim Witness Act of 1996, 18 U.S.C. § 3663A(c)(1)(A)(ii), which specifically authorized restitution to the victims of criminal conduct. *See United States v. Newman*, 144 F.3d 531, 537 (7th Cir.1998). The amended statute applies to defendants convicted on or after April 24, 1996, the effective date of the statute. *See* 18 U.S.C. § 2248; *Newman*, 144 F.3d at 537. Hoover was convicted in 1998, so the amended statute applies to him. Thus, there is statutory authority for the restitution order to Purdue, the victim of Hoover's criminal misrepresentation.

■ Similarly, there is statutory authority for the order of restitution for the costs of Hoover's court-appointed counsel. Reimbursement for the cost of court-appointed counsel is governed by the Criminal Justice Act, 18 U.S.C. § 3006A(f). *See United States v. Gurtunca*, 836 F.2d 283, 288 (7th Cir.1987). Reimbursement of attorney's fees under § 3006A(f) is " 'a matter with[in] the ... discretion of the district court and not such an event that requires the procedural safeguards of an adversary hearing.' " *United States v. Embry*, 128 F.3d 584, 585 (7th Cir.1997) (quoting *United States v. Durka*, 490 F.2d 478 (7th Cir.1973)). The text of § 3006A(f) shows that the court is empowered to direct that reimbursement for representation under the Criminal Justice Act come from specific funds. Section 3006A(f) provides:

> Receipt of other payments.—Whenever the United States magistrate or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney, to any person or organization authorized pursuant to subsection (e) to render investigative, expert, or other services, or to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section ...

18 U.S.C. § 3006A(f). Thus, the district court had authority to order that restitution be applied toward payment of court-appointed counsel and the defendant's expert.

■ Since the district court did not have the legal authority to order restitution to the IRS for Hoover's tax liability, the defendant is entitled to modification of the order. However, we affirm the resti-

tution order as applied to the costs of court-appointed counsel and reimbursement to Purdue.[1]

## 3. Contempt.

 Hoover argues that the district court abused its discretion when it held him in contempt and sentenced him to an additional six months in prison for physically placing half of the bonds into his son Michael's possession after the court ordered that he "not cash, negotiate or transfer any United States savings bonds, period."[2] We will not reverse a district court's contempt ruling unless it was an abuse of discretion. *United States v. Silva*, 140 F.3d 1098, 1101 (7th Cir.1998).

 The government raises a threshold question of whether there is jurisdiction to hear this argument on appeal. It argues that this court lacks jurisdiction because Hoover filed his notice of appeal on August 3, 1998, but the district court did not sentence him for contempt until September 18, 1998. Rule 3(a) of the Federal Rules of Appellate Procedure requires that the notice of appeal state the judgment or order appealed from. Yet, Hoover's notice of appeal did not state that appeal was being taken from the contempt order because it was filed approximately six weeks before Hoover was held in contempt. As the government correctly states, a notice of appeal from a conviction

and sentencing proceeding simply cannot be interpreted as a notice of appeal from all future district court proceedings. *United States v. Dennis*, 902 F.2d 591, 593 (7th Cir.1990).

At oral argument, Hoover's counsel informed this court that he had in fact filed a notice of appeal from the contempt order. Exhaustive review of the record, however, shows that this is not the case. Therefore, since Hoover never filed a notice of appeal from the contempt order, this court has no jurisdiction to review that decision and we need not address the merits of Hoover's argument.

## 4. Sufficiency of the evidence showing "willfulness" of Hoover's conduct.

 Hoover's final argument is that his conviction should be overturned because the evidence was insufficient to establish the necessary element of willfulness. We review the evidence in the light most favorable to the government, and will reverse a conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Hill*, 40 F.3d 164, 166 (7th Cir.1994). A defendant has a heavy burden in challenging a conviction based on the sufficiency of the evidence. *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.1996). In this case, the record indicates that at the close of the govern-

---

1. Additionally, Hoover asserts that since the bonds belonged to his sons, not him, the court lacked jurisdiction to order that his sons surrender the bonds to satisfy their father's order of restitution. This claim is not persuasive for two reasons. First, it ignores the fact that the evidence showed, and the district court specifically found, that Hoover put the bonds in his sons' names in order to evade legal responsibilities and that Hoover, rather than his sons, controlled the bonds at all times. Second, Hoover failed to bolster this claim with any meaningful legal or factual arguments. As this court has stated before, "[w]e need not address those arguments which are undeveloped." *United States v. Martinez*, 169 F.3d 1049, 1052 (7th Cir.1999) (citing *United States v. Dawn*, 129 F.3d 878, 881 (7th Cir. 1997)).

2. The government claims that Hoover's argument "misses the point" because the district court held Hoover in contempt of its order at sentencing on July 24, 1998 which required that Hoover "take, by August 7, 1998, all steps necessary to turn over to the government full title" to the savings bonds to be applied toward restitution, not the earlier order with the "cash, negotiate or transfer" language. However, for purposes of this appeal it does not matter from which of its orders the district found Hoover in contempt because, as we discuss in the text of this section, Hoover waived this issue by not filing a notice of appeal from the contempt order.

ment's evidence, Hoover moved for a judgment of acquittal on the conspiracy count, but not on the false statement or tax counts. By failing to move for a judgment of acquittal on these counts, Hoover has forfeited any challenge to the sufficiency of the evidence absent a "manifest miscarriage of justice." *United States v. Archambault*, 62 F.3d 995, 998 (7th Cir.1995). It follows then that the review is for plain error, *United States v. McKinney*, 143 F.3d 325, 329 (7th Cir.1998), and we will reverse only " 'if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the event was so tenuous that a conviction would be shocking.' " *Id.* at 329–30 (quoting *United States v. Wright*, 63 F.3d 1067, 1072 (11th Cir.1995)).

In order for a defendant to be convicted of making false statements in violation of 18 U.S.C. § 1001, the government must prove that: (1) the defendant made a statement; (2) the statement was false; (3) the statement was material; (4) the statement was made knowingly and willfully; and (5) the statement concerned a matter within the jurisdiction of a federal department or agency. *United States v. Ross*, 77 F.3d 1525, 1543–44 (7th Cir.1996). Similarly, the statute governing the filing of false tax returns, 26 U.S.C. § 7206(1), provides that:

> Any person who—
>
> (1) Wilfully makes and subscribes any return ... which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony.

Hoover argues that there is no evidence in the record to support a finding that he acted wilfully, a required element for convictions under both statutes, because he did not act with an intent to violate a known legal duty. Rather, he claims that the evidence supports a finding that he acted with the intent to protect his assets from his ex-wife and that he did not intend to defraud the government. Hoover's argument is unconvincing.

As the government noted, there is ample evidence in the record that Hoover acted wilfully. For instance, he admitted during a deposition in his divorce proceedings that he understood that his tax returns were not truthful and that he had substantial unreported income from his dairy business. Further, in 1989 Michael asked Hoover about his tax liability from the dairy business and Hoover assured his son that he was reporting all the milk income on his own income tax returns. Finally, and perhaps most damaging to Hoover's argument, was the fact that Hoover had H & R Block prepare tax returns for him for 1990, 1991 and 1992, but he chose not to file those returns. When the IRS sought information about Hoover's tax returns from H & R Block, Hoover asked an H & R Block employee not to turn the returns over because they could get him in trouble. This behavior indicates that Hoover knew he had a legal duty to report the income and he wilfully violated that duty.

Similarly, Hoover stated on the application for his son Tadd's financial aid that he had no income in 1991 when in fact he had over $100,000 in unreported income that year. Also, Hoover indicated on the application that he had only $13 in assets while he maintained over $100,000 in an investment account. Based on these misrepresentations, Tadd was awarded over $7,000 in financial aid from Purdue. It is difficult to accept Hoover's assertion that his true motivation was to hide his assets from his ex-wife, when the obvious result of his lies was substantial economic windfalls to himself at the expense of the government and Purdue University. The sheer magnitude of the concealed income and assets shows that it was deliberate and intentional fraud, not just a mistake or oversight.

The weight of the evidence shows that there was no manifest miscarriage of justice in the verdict. Even reviewing under the slightly more rigorous standard of

"weighing the evidence in the light most favorable to the government" we come to the same result, and thus, we affirm Hoover's convictions.

### III. CONCLUSION

For the reasons stated herein, we RE-MAND for modification of the restitution order entered by the district court to the extent that it applies to Hoover's tax liability, but in all other respects we AFFIRM Hoover's conviction and sentence.