In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2223

United States of America,

Plaintiff-Appellee,

v.

Harvey L. Hoover,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 97-CR-0019--Robert L. Miller, Jr., Judge.

Argued January 19, 2001--Decided February 14, 2001


    Before Flaum, Chief Judge, and Posner and Ripple,
Circuit Judges.

    Flaum, Chief Judge.  After being found guilty of
filing a false statement on a financial aid
application, and of filing false income tax
returns, the district court ordered that Harry
Hoover not transfer any of the 304 United States
savings bonds that he had in his possession.
Within weeks, Hoover gave his son approximately
half of the bonds in question. The district
court, therefore, found Hoover in contempt of
court, and sentenced him to six months of
imprisonment, in addition to the 46 months he had
received on the substantive charges. Hoover
unsuccessfully appealed his conviction on those
substantive charges, and now returns to challenge
his sentence for contempt of court. For the
reasons stated herein, we affirm the district
court's decision.

I.  BACKGROUND

    Harvey Hoover was a dairy farmer in Wabash
County, Indiana./1 His sons, Michael and Tadd,
helped him run his farm. In 1989, Hoover and his
wife, Judith, became entangled in bitter divorce
proceedings. As a result of the eventual divorce
decree, Judith was granted judgments against
certain assets of the farm. Hoover became
consumed with saving the farm from falling into
his ex-wife's possession. Thus, Hoover began
titling his assets and bank accounts in the names
of his children. In April of 1991, Hoover
redeemed a number of savings bonds, thereby

receiving $130,512. Hoover used the money he received from redeeming those bonds to purchase new bonds and certificates of deposit, all in the names of Michael and Tadd Hoover. However, Hoover never informed the children that he had done so. Additionally, Hoover opened a bank account in Tadd's name and frequently forged Tadd's name on checks and other documents.

Through a variety of such schemes, Hoover also managed to keep much of his wealth hidden from the Internal Revenue Service. In the process of executing against the divorce judgments, Hoover's tax and dairy records were subpoenaed. Those records helped reveal that between 1990 and 1992, Hoover had almost $500,000 of unreported income. Hoover was charged and tried on one count of conspiracy to defraud the government, one count of filing a false statement on a college financial aid application,/2 and three counts of filing false income tax returns. While he was acquitted of the conspiracy charge, Hoover was convicted by a jury on the remaining charges. Following the return of the verdict, the government requested that the court "freeze" 304 bonds/3 that Hoover had in his possession. The court ordered that Hoover "not cash, negotiate or transfer any United States savings bonds, period." At that point, the government noted that "the only fly in the ointment" with the court's order was that the bonds in question were in the names of Michael and Tadd Hoover. To this, the court stated that its order specifically referred to those bonds and that it was "ordering [Hoover] not to do anything with them." Nonetheless, within weeks of the order, Hoover turned over possession of 150 of those bonds to his son, Michael.

On July 24, 1998, the court sentenced Hoover to 46 months of imprisonment. As part of the sentence, the court ordered Hoover to turn over to the United States government, by August 7, 1998, title to the 304 savings bonds. Though Hoover objected to what he characterized as an "allegation" that the bonds were his, as opposed to Michael's and Tadd's, the court found that the bonds belonged to Hoover, and saw no reason why those bonds should not be applied to satisfy Hoover's various obligations. Hoover filed a notice of appeal on August 3, 1998. On September 18, 1998, the court held a hearing at which it found that by giving possession of the 150 bonds to Michael, Hoover was in contempt of its order. For that, the district court sentenced Hoover to an additional six months of imprisonment.

Hoover's conviction was upheld on appeal. See Hoover, 175 F.3d 564. However, we did find that the district court had exceeded its authority to

the extent that it had ordered Hoover to surrender savings bonds to satisfy his tax liability. Id. at 569. Thus, we determined that Hoover was entitled to modification of the restitution order in that respect. Id. While Hoover had also attempted to appeal his six-month contempt sentence, we determined that we lacked jurisdiction to entertain that argument. Id. at 570. Hoover's notice of appeal had been filed on August 3, 1998. However, it was not until approximately six weeks later that Hoover was held in contempt by the district court. Since a notice of appeal from a conviction and sentencing cannot be interpreted as a notice of appeal from all future district court proceedings, United States v. Dennis, 902 F.2d 591, 593 (7th Cir. 1990), Hoover had never filed a notice of appeal from the contempt order. Therefore, we could not address the merits of that claim. Hoover, 175 F.3d at 570.

Hoover has now properly filed a notice of appeal from the contempt sentence, and returns to this court, urging that we reverse that decision of the district court. In particular, he contends that the order that he "not cash, negotiate or transfer any United States savings bonds, period," was not reasonably specific. Additionally, he puts forth that the government failed to prove, beyond a reasonable doubt, that he had willfully violated the district court's order.

II.  DISCUSSION

The essential elements of criminal contempt are a lawful and reasonably specific order of the court, and a willful violation of that order. See Doe v. Maywood Hous. Auth., 71 F.3d 1294, 1297 (7th Cir. 1995). Under the applicable standard of review, we cannot reverse a district court's contempt ruling unless that ruling constituted an abuse of discretion. United States v. Silva, 140 F.3d 1098, 1101 (7th Cir. 1998). On appeal, Hoover asserts that such an abuse of discretion has occurred, as (1) the district court's order was not reasonably specific, and (2) it was never sufficiently proven that Hoover willfully violated the court's order. With both of these contentions, we disagree.

Hoover does not dispute that he gave physical possession of half of the savings bonds to his son. However, he points out that in doing so, he did not transfer title or ownership of the bonds, but merely returned the bonds to their natural owner./4 Thus, he urges that the dispositive issue in this portion of his appeal is what the definition of the word "transfer" is, and whether the definition would include his act of

conveyance. While it appears as if Hoover is forging a semantical argument, he does not present any definition of the term "transfer" which would exclude the act he undertook. Our examination of various dictionaries indicates that the term transfer includes the changing of possession as well as of title and/or ownership. See, e.g., Black's Law Dictionary (6th ed. 1990) ("Transfer means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property. . ."); see also Webster's Third New International Dictionary (1961) (defining transfer to include "1(a) to carry or take from one person or place to another; 1(b) to move or send to a different location over the possession or legal title of one to another. . . . 2(a) the conveyance of right, title, or interest in either real or personal property, from one person to another by sale, gift, or other process."). That the definition of the term may encompass acts of conveying title or ownership to property does nothing to combat the reality that it also (if not primarily) includes conveying physical possession of property.

Moving away from the lexicon, we believe the district court's order intended to prohibit the actions undertaken by Hoover. The government had requested that the court freeze the 304 bonds because it feared that, by the time sentencing was imposed, Hoover would have caused those bonds to be unavailable for restitution purposes. Recognizing that there were a variety of ways in which Hoover could dispose of the bonds, the court made its order as broad as possible, stating: "I will go ahead then and order that the defendant, pending further order of the court, not cash, negotiate or transfer any United States savings bonds, period." If Hoover believed the court was merely placing some limitations on what he could do with those bonds, the court's subsequent statement that it was "ordering him not to do anything with them," disposed of any legitimate doubts. By giving physical possession of the bonds to his son, Hoover accomplished exactly what the district court had intended to avoid; namely, having those bonds be unavailable for restitution purposes at the agreed upon date. Simply put, the order was abundantly clear, and the court did not abuse its discretion in finding Hoover's actions to fall within the gamut of prohibited activities.

Alternatively, Hoover argues that even if the order was reasonably specific, the government never proved beyond a reasonable doubt that Hoover willfully violated that order. Though Hoover does not specifically state so, his

contention amounts to a sufficiency of evidence challenge. When deciding whether sufficient evidence supported a district court's finding of criminal contempt, we determine whether any reasonable trier of fact could have been convinced of guilt beyond a reasonable doubt. See Doe, 71 F.3d at 1297. The district court's finding will be sustained if there is substantial evidence to support it. Id. Further, in evaluating the district court's reasoning, we defer to its determination of the witness' credibility at the evidentiary hearing. See, e.g., United States v. Messino, 55 F.3d 1241, 1252 (7th Cir. 1995) (district judge in best position to assess credibility of defendant because judge is intimately familiar with record and has opportunity to observe defendant's demeanor at hearing).

In support of his argument, Hoover notes that, after his sentencing, he requested that Michael return to him the bonds which he had previously given to Michael. This fact, he suggests, shows that he did not willfully violate the court's order not to transfer the bonds. We have defined willfulness as a "volitional act done by one who knows or should reasonably be aware that his conduct is wrongful." Doe, 71 F.3d at 1297. Having already determined that the district court's order was sufficiently clear, we find that a trier of fact could readily conclude beyond a reasonable doubt that Hoover's transfer of the bonds to his son was a willful violation of the court's order. Given that Hoover was aware (or at the very least should reasonably have been aware) that his conduct was wrongful, we fail to see how his violation could not be considered willful. That Hoover may have had a subsequent change of heart (and therefore wanted the bonds returned to him so that they could be used to assist in his restitution payments) does nothing to cast doubt on the fact that he willfully violated the court's order. Thus, we conclude that there was sufficient evidence to support the finding that Hoover intentionally violated the district court's order.

## III. CONCLUSION

The district court's order was reasonably specific, and Hoover wilfully violated it.

For the foregoing reasons, we Affirm the decision of the district court.

## FOOTNOTES

/1 The facts of Hoover's case are set forth in greater detail in our prior opinion of United States v. Hoover, 175 F.3d 564, 566-67 (7th Cir.

1999).

/2 While Tadd was matriculating at Purdue University, Hoover signed and submitted an application for student loans on his behalf. On that form, Hoover stated that he (Hoover) had no income in 1991, that he did not file an income tax return that year, and that he had assets of only $13.00. Based on those representations, Tadd received over $7,000 in financial aid from Purdue that year.

/3 There is some confusion as to whether there were 304 or 308 bonds in Hoover's possession at the time the order was entered. For purposes of this appeal, we will assume that the correct number is 304. However, because the district court's order was broad (in that it referred to "any United States savings bonds"), and because the number of bonds which Hoover gave to his son is undisputed, the actual quantity of bonds Hoover originally had in his possession is not relevant for our purposes.

/4 To the extent that Hoover claims that his action was not a violation of the order in that he merely returned the bonds to their rightful and legal owner, namely Michael, we previously determined that argument to be unpersuasive. See Hoover, 175 F.3d at 570 n.1 (finding such an argument to be meritless because "the evidence showed, and the district specifically found, that Hoover put the bonds in his sons' names in order to evade legal responsibilities and that Hoover, rather than his sons, controlled the bonds at all times.").