*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
　　　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

ROBERT WILSON,
　　　　　　　　　　*Defendant-Appellant.*

No. 08-6229

> Appeal from the United States District Court
> for the Western District of Kentucky at Louisville.
> No. 06-00010-003—Charles R. Simpson III, District Judge.

Argued: January 14, 2010

Decided and Filed: March 1, 2010

Before: SUHRHEINRICH, SUTTON and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** R. Gregg Hovious, FULTZ MADDOX HOVIOUS & DICKENS, PLC, Louisville, Kentucky, for Appellant. Elizabeth H. Parks, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** R. Gregg Hovious, FULTZ MADDOX HOVIOUS & DICKENS, PLC, Louisville, Kentucky, for Appellant. Elizabeth H. Parks, Terry M. Cushing, Monica Wheatley, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. The Criminal Justice Act authorizes district courts to appoint counsel for criminal defendants if they are "financially unable" to hire counsel of their own. 18 U.S.C. § 3006A(b). The Act also permits a court to terminate the appointment, and order repayment for the services provided, if "at any time after the

1

appointment" the court learns that the defendant is "financially able" to obtain counsel or pay for the representation already provided.  *Id.* § 3006A(c), (f).

In this case, because Robert Wilson had not obtained counsel by his arraignment in August 2006 and because he was incarcerated at the time, the district court appointed the public defender's office to represent him.  Toward the end of his six-week trial, which began in late 2007 and ended in January 2008, the court learned that Wilson had been staying at the "historic Brown hotel" in downtown Louisville throughout the trial, at a cost of roughly $10,000, after turning down the government's offer of free accommodations.  R.229 at 5. Further inquiry revealed that, by early 2007, Wilson was not a traditional candidate for free legal services:  His income in 2007 totaled roughly $134,000; he lived in an exclusive section of San Francisco, where he paid $2,300 per month in rent; he has no dependents; his discretionary income in 2007 allowed him to spend at least $18,000 on the kinds of restaurants and wineries not known for catering to indigents; and Wilson's friends had created a $44,000 fund to pay for his legal services in the case.

Recognizing that this was not the type of person Congress had in mind when it authorized the government to provide legal services to indigent criminal defendants, the district court was not pleased.  After further factual investigation, it ordered Wilson to pay $52,305 in "reasonable monthly payments" for the costs of the public defender's services. *Id.* at 26.  Happily for Wilson, the fee was worth it, as he was acquitted on all charges. Unhappily for Wilson, the district court did not abuse its discretion in ordering him to pay for the representation.

I.

On July 10, 2006, a grand jury indicted Wilson for conspiring to commit wire fraud and for aiding and abetting false statements on another individual's tax returns.  At his arraignment in August 2006, Wilson, then serving a prison sentence on a separate conviction, arrived without a lawyer but said he wanted to hire one.  He claimed that he did not have the resources to hire a lawyer at the moment, but he explained that would change soon (presumably when his sentence ended at the end of 2006).  The court quizzed Wilson on his finances and learned that:  on the one hand, he was currently in bankruptcy, was earning 18 cents an hour in prison and had no substantial assets; but, on the other hand, he

does consulting (outside of prison) at $150 an hour, has "no problem making money" because he is "the world's foremost expert in [his] field" (antique weapons) and, once he is released from prison in December 2006, he will "be making money again." *Id.* at 22. The magistrate judge appointed the public defender's office to handle the case until Wilson could raise the funds for private counsel, which Wilson continued to express an interest in obtaining. At a detention hearing the next day, the magistrate judge instructed Wilson that, "if you do retain private counsel, just let [the federal public defender] know that, all right? Then the Court will relieve the federal defender of your representation." R.299 at 3.

For the next fifteen months, nothing happened—at least so far as Wilson's interest in hiring a private attorney was concerned. The public defender's office continued to represent Wilson, even after he finished serving his prison term in December 2006 and after he began consulting again.

At a pre-trial hearing on November 13, 2007, only weeks before the December 3 trial date, Wilson moved to substitute Philadelphia attorney Robert Goldman as his counsel. In support of his motion, Wilson reiterated his earning potential and added that his friends had started a collection for his legal costs, though he acknowledged he had not yet hired Goldman and did not yet have the funds to do so. In view of these circumstances and the reality that Wilson's request came too close to the December 3 commencement of the multi-defendant trial, the magistrate judge denied the motion.

Toward the end of the six-week trial, in the midst of jury deliberations, the district court learned that Wilson "resided in an exclusive area of San Francisco" and had turned down free lodgings to stay at the "historic Brown Hotel" during the trial, raising concerns about his eligibility for free representation. R.229 at 6. The court asked the magistrate judge to hold a hearing about Wilson's eligibility for free legal services.

In the course of investigating Wilson's finances, the magistrate judge learned that his income in 2007 included $99,000 from cataloguing and book-writing for an auction house, $18,000 in social security, $16,000 in royalties on his books and roughly $1,000 from direct book sales. All told, his income for 2007 was in the neighborhood of $134,000. His expenses for 2007 included $27,600 in rent ($2,300 per month), $3,500 in business-related travel expenses, $6,000 in medical expenses, $1,500 in clothes and over $18,000 in

restaurant and wine tabs. He claimed to have few assets beyond his considerable library, which he used for his scholarship and consulting business. He also reported the following liabilities: $375,000 in restitution from his previous criminal case, which he was paying at roughly $1,000 per month from his $16,000 a year in book royalties; legal bills of $28,414; and state and federal tax debts totaling $99,049, though he was not yet paying back the tax debts. In contrast to his statements to the court in August 2006, when Wilson claimed he would have steady income once out of prison, he testified that in retrospect he had been too optimistic about his work prospects at the initial hearing, noting that he had been dropped from one book project and had failed to publish another. At the hearing, the magistrate judge also learned the details of a $44,000 trust fund that Wilson's friends had set up to pay for an attorney for him, and that Wilson had used $10,000 from the fund to stay at the Brown Hotel during the trial.

In August 2008, the magistrate judge issued a 26-page report recommending that Wilson reimburse the government $52,305 in "reasonable monthly payments." R.229 at 26. The Criminal Justice Act, he reasoned, provides that a court may order payment whenever it "finds that funds are available for payment from or on behalf of a person furnished representation," 18 U.S.C. § 3006A(f), and that the "availability" of funds requires that "an order of reimbursement will not result in the Defendant suffering extreme hardship," R.229 at 13. Noting Wilson's "tremendous capacity to earn income" and his taste for fine dining—emphasizing the more than $18,000 spent on food and wine during 2007—the magistrate judge found that Wilson would not suffer "extreme hardship" from such an order and that, "at most, he will be forced to scale back his dining out schedule if ordered to reimburse the government." *Id.* at 18. In reaching this conclusion, the magistrate judge opted not to rely on the $44,000 trust account, concluding that it was not "available" for reimbursement because Wilson did not contribute to the fund or control it.

Wilson objected to the magistrate's report, claiming he should not have to pay for any of his legal representation. A finding that "funds are available," he argued, should focus on *present* ability to pay, not past or future income. And his financial standing had deteriorated since the original hearing, he added, attaching an August 2008 affidavit describing less consulting work in 2008 than in 2007 and stating he was $10,000 behind on his rent.

In October 2008, the district court adopted the report and recommendation in its entirety. It ordered Wilson to repay the government the full amount and noted that Wilson's "affidavit . . . offers, at best, the representation of an uncertain future and his unsubstantiated statement of a diminished income during the first half of 2008." R.244 at 2 n.1.

II.

Under the Criminal Justice Act, the government must provide legal services for criminal defendants unable to pay for them. In relevant part, the Act says:

> **(b) Appointment of counsel.**— . . . [T]he United States magistrate judge or the court, if satisfied after appropriate inquiry that *the person is financially unable* to obtain counsel, shall appoint counsel to represent him. . . .
>
> **(c) Duration and substitution of appointments.**— . . . If at any time after the appointment of counsel the United States magistrate judge or the district court finds that *the person is financially able to obtain counsel or to make partial payment for the representation*, it may terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate. . . .
>
> . . .
>
> **(f) Receipt of other payments.**—Whenever the United States magistrate judge or the court finds that *funds are available for payment* from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney, to any [authorized investigator or expert], or to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section. Except as so authorized or directed, no such person or organization may request or accept any payment or promise of payment for representing a defendant.

18 U.S.C. § 3006A(b), (c), (f) (emphases added).

What the Act gives with one hand to a criminal defendant "financially unable" to pay for legal services it takes away with the other if the defendant turns out to be "financially able" to obtain counsel. The Act gives district courts authority to terminate an appointment of counsel *and* to require the defendant to pay for services provided. "Whenever" the court "finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney,

. . . legal aid agency or community defender organization . . . or to the court for deposit in the Treasury as a reimbursement." *Id.* § 3006A(f).

The parties share some common ground in applying these provisions. They do not dispute that a judicial decision to terminate or modify a court appointment should not be taken lightly: A thorough inquiry into the defendant's finances, though not a full adversarial hearing, should precede any such order. *See, e.g.*, *United States v. Hoover*, 175 F.3d 564, 569 (7th Cir. 1999). They do not dispute that the magistrate judge's hearing in this case, together with his 26-page report, satisfied this requirement. And they do not dispute that the fact-intensive nature of this inquiry requires us to review the district court's ultimate decision for abuse of discretion. *See United States v. McGiffen*, 267 F.3d 581, 588–89 (7th Cir. 2001).

The parties also do not dispute one other point: that a court has authority to order a defendant to pay for counsel on his own or "to make partial payment for the representation" on a going-forward basis *and* to order "financially able" defendants to pay for legal services already provided on a backward-looking basis. The magistrate and district court assumed that the Act permits retrospective reimbursement orders of the last sort. Several appellate courts have read the Act the same way. *See, e.g.*, *Hoover*, 175 F.3d at 569; *United States v. Merric*, 166 F.3d 406, 409 (1st Cir. 1999); *United States v. Evans*, 155 F.3d 245, 252 n.8 (3d Cir. 1998). No court to our knowledge has said that trial courts have no such authority. And the Supreme Court, in considering *state* provisions that permit after-the-fact recoupment of money for legal services already provided, has described § 3006A(f) as a comparable "reimbursement" provision. *James v. Strange*, 407 U.S. 128, 132 n.6 (1972); *see also Fuller v. Oregon*, 417 U.S. 40, 46 n.7 (1974).

What principally divides the parties is whether Wilson has "funds . . . available" to pay for the services provided by the public defender. Wilson first argues that the district court erred in requiring him to make *any* payment because, by the time the district court issued its order, he had few liquid assets available for the payment. That is a non-starter. Surely, in view of Wilson's 2007 financial information, which covered the most recent data, which was most pertinent to a 2007 trial and which included income well over $100,000,

Wilson had *some* assets and income available to compensate the public defender's office for its representation.

The resolution of Wilson's second argument—that he does not have sufficient "funds . . . available" to pay the full $52,305 fee award—is more complicated. Two things stand out about Wilson's case relative to others in this area, and they point in opposite directions. One: this is an unusually large award, as most reimbursement awards upheld under the Act have come in at under $10,000, with one exception to our knowledge. *See United States v. Lefkowitz*, 125 F.3d 608, 621 (8th Cir. 1997) ($316,693.70). The other: Wilson's conspicuous habits of consumption and substantial discretionary income before and during the trial show that he was not the kind of person Congress had in mind when it authorized free legal services for indigent criminal defendants.

The Act gives district courts considerable discretion in navigating these and other considerations. Subsections (b), (c) and (f) of the Act refer to whether a defendant is "financially unable" or "able" to pay for counsel in full or in "part[]," to whether "funds are available for payment from or on behalf of a person furnished representation" and to whether an "authoriz[ation] [of] payment" is in "the interests of justice." Read together and in context, these overlapping concepts—an ability to pay, an availability of funds, the interests of justice—speak in generalities, not specifics, and thus do not draw strict lines about the kinds of income and assets that courts may consider in issuing reimbursement orders. They instead suggest a pragmatic inquiry into whether a defendant could afford, or could have afforded, to pay for counsel at the outset, and whether it is fair to make the defendant pay for counsel after the fact.

Consistent with these flexible standards, the district court looked at a range of permissible considerations. In considering Wilson's income, the court focused on 2007—the most recent full year of documented earnings and the year of the trial. Because Wilson was self employed, he did not have a regular salary, making 2007 an appropriate gauge of his earning power for this reason as well. *See United States v. Parker*, 439 F.3d 81, 95 (2d Cir. 2006)*; United States v. Gurtunca*, 836 F.2d 283, 284, 288 (7th Cir. 1987); *United States v. Harris*, 707 F.2d 653, 660–61 (2d Cir. 1983). No doubt, in other circumstances, the court also might have looked to earlier years, but because Wilson was incarcerated in 2006, that

year did not provide a realistic assessment of his capacity to pay for counsel.  The court likewise properly considered Wilson's expenses and debts, again using 2007 as the most appropriate measure of his obligations.

After looking at these sources of income and liability, the district court did not exceed its discretion in ordering Wilson to repay $52,305 in "reasonable monthly payments." Several considerations support the court's order.  Early in the case, Wilson told the court that, once he was released from prison, he had "enough work for 35 years" and that he had "no problem making money" because he is "the world's foremost expert" in antique weapons.  His 2007 income confirmed those projections, as he earned roughly $134,000 in 2007 from consulting at $150 an hour, book royalties and social security.  All of this suggested that, even in the absence of substantial liquid assets, Wilson's income stream would permit him to pay the award out of current income through "reasonable monthly payments." Wilson's expenses and liabilities did not undermine that conclusion.  He has no dependents.  And while his 2007 expenses were considerable, $18,000 of them were for the kinds of things—fine dining and wine—that do not justify requiring the public fisc to pay for one's legal representation.  Even then, moreover, the $18,000 figure likely understates the expenditures, as the calculation includes only checking account entries explicitly identified as dining expenses.  As the district court pointed out, Wilson, "at most, will be forced to scale back his dining out schedule if ordered to reimburse the government," particularly given that the order does not require an all-at-once payment but "reasonable monthly payments" over a span of years, not months.  R.229 at 18, 26.

Wilson offers several responses, none of them convincing.  First, he argues that the statute, by setting out a standard "in the present tense," allows the court to look only at whether Wilson was able to pay "at that point in time, not at some randomly-selected moment in the past." Wilson Br. at 12–13; *see* 18 U.S.C. § 3006A(c) ("is financially able"); *id.* § 3006A(f) ("funds are available").  In one sense, Wilson is right, as some courts have suggested.  *See United States v. Danielson*, 325 F.3d 1054, 1077 (9th Cir. 2003); *United States v. Jimenez*, 600 F.2d 1172, 1174 (5th Cir. 1979).  A court, for example, could not premise a § 3006A reimbursement order on a year's worth of income, even the most recent year of income, if it no longer had any realistic bearing on Wilson's capacity to pay the award.  In this case, however, not only was 2007 a profitable year for Wilson, but the

evidence, credited by the district court, showed that Wilson had a substantial earning capacity going forward. Recent income can be, and in this instance was, a legitimate proxy for present ability to pay.

Second, Wilson argues that the court must make a "specific finding" of what assets are currently available to pay an award. Wilson Br. at 19. To the extent Wilson means to argue that the only kind of income and assets eligible to pay an award under the statute are presently identifiable liquid assets—$52,350 in cash here—that is mistaken. Just as a court could require a defendant to use an income stream, as opposed to a specific liquid asset, to pay for an attorney before a trial, it could require a defendant to use present income to pay for an attorney after the trial in reasonable monthly payments. A court likewise might find a defendant "financially able" to pay based on money pending in escrow even though those funds will not become "available for payment" until some future date.

Third, Wilson argues that, even on the court's own terms, it erred in finding him capable of making this reimbursement. His financial condition was precarious in 2007, he points out, and it deteriorated in 2008. But Wilson's spending habits during 2007 suggest otherwise. If he was in financial straits in 2007, it is hard to understand why or how he could spend so much on fine food and drink that year. *Cf. United States v. Thomas*, 630 F. Supp. 820, 822 (E.D. Mich. 1986) ("Much of the defendant's financial problems . . . are of his own making . . . ."), *aff'd*, 815 F.2d 81 (6th Cir. 1987) (table). In filing an affidavit with the court in August 2008 after the hearing before the magistrate and in supplying no other financial information about his 2008 income, Wilson gave the district court good reason for saying this was "too little, too late" and that the affidavit "offers, at best, the representation of an uncertain future and an unsubstantiated statement of a diminished income during the first half of 2008." R.244 at 2 n.1. The court, in short, did not abuse its discretion in standing by the magistrate's recommendation based on Wilson's 2007 income and his earlier statements.

One final point. The court's order says that Wilson must make the $52,350 reimbursement in "reasonable monthly payments," but it never spells out what those monthly payments are. Some time has passed since the court's September 2008 order, and any effort to ensure that a monthly payment schedule is "reasonable" will require a current inquiry into

Wilson's fortunes.  If Wilson's financial situation has indeed materially deteriorated, the court may well wish to consider that reality in determining how large the monthly payments should be, and, if the deterioration is considerable, whether the reimbursement order should be decreased.  An Act designed to permit the destitute to obtain free legal services at the outset of a case should not make an otherwise solvent individual destitute at the end of the case.

III.

For these reasons, we affirm.