RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0056p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

CHARLES D. MICKEY,

         *Plaintiff-Appellant,*

    *v.*

ZEIDLER TOOL AND DIE COMPANY; HAROLD
DEFORGE,

         *Defendants-Appellees.*

No. 06-1960

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-70340—Nancy G. Edmunds, District Judge.

Argued: October 30, 2007

Decided and Filed: January 31, 2008

Before: BATCHELDER, MOORE, and COLE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Teresa J. Gorman, TERESA J. GORMAN PLLC, Bingham Farms, Michigan, for
Appellant. Andrew T. Baran, COX, HODGMAN & GIARMARCO, Troy, Michigan, for Appellees.
**ON BRIEF:** Teresa J. Gorman, TERESA J. GORMAN PLLC, Bingham Farms, Michigan, for
Appellant. Andrew T. Baran, COX, HODGMAN & GIARMARCO, Troy, Michigan, for Appellees.

    COLE, J., delivered the opinion of the court, in which MOORE, J., joined. BATCHELDER,
J. (pp. 10-11), delivered a separate concurring opinion.

---

**OPINION**

---

    R. GUY COLE, JR., Circuit Judge. Plaintiff-Appellant Charles D. Mickey appeals the
district court's grant of summary judgment on his claims brought under the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and Michigan's Elliott-Larsen Civil Rights
Act ("ELCRA"), MICH. COMP. LAWS §§ 37.2101 *et seq.* Mickey's lawsuit advances two claims:
(1) that Zeidler Tool & Die Company ("Zeidler"), his employer, and Harold DeForge, the sole
owner of Zeidler, discriminated against him on the basis of age in reducing his salary and benefits,
and in terminating him; and (2) that Zeidler terminated him in retaliation for filing a charge of age
discrimination with the Equal Employment Opportunity Commission ("EEOC"). The district court
held that Mickey failed to establish a prima facie case of age discrimination, finding that Mickey

1

had not shown that he was replaced by a significantly younger person. Although Zeidler terminated Mickey immediately upon receiving notice of his EEOC complaint, the district court also concluded that Mickey failed to establish a prima facie case of retaliation because he was unable to show a causal connection between his protected activity and his termination. Finally, the district court found that, even if Mickey had established a prima facie claim of retaliation, Zeidler offered legitimate, non-discriminatory business reasons for terminating Mickey and that Mickey failed to demonstrate that those reasons were a pretext for discrimination.

For the reasons discussed below, we AFFIRM the district court's grant of summary judgment to Zeidler on Mickey's age discrimination claims; REVERSE the district court's grant of summary judgment to Zeidler on Mickey's retaliation claims; and REMAND the case for further proceedings consistent with this opinion.

## I.

Mickey is a sixty-seven year old man, born November 28, 1940, who worked for Zeidler for thirty-three years, from 1971 until his termination on October 19, 2004. Shortly after Mickey began working as a die-maker at Zeidler, Harold DeForge purchased the company, and he remains its sole owner. Around 1972, DeForge promoted Mickey to the position of die-leader, and in 1974 promoted him again to the position of shop supervisor. As a shop supervisor, Mickey supervised some twenty to forty employees.

In 1979, Mickey hired Patrick Rhein, a then-eighteen year old recent high school graduate, born May 19, 1961, as an apprentice at the wage of $4.50 per hour. Mickey trained Rhein, who completed his apprenticeship in 1983 and became a die maker. In the late 1980s, DeForge opened Limberlost Farms, a bed-and-breakfast business in northern Michigan catering to deer hunters. DeForge operated Limberlost during the months of September and October. DeForge began spending four days per week at Limberlost Farms and the remaining three days, Tuesday through Thursday, at Zeidler.

Due to his decreased involvement with Zeidler, in 1992 DeForge created the position of General Manager, moving Mickey to this position, and promoted Rhein to shop supervisor to replace Mickey. By 1995, Mickey was earning a yearly salary of $90,000 and Rhein was earning $70,000. In late 1997, DeForge lowered Mickey's salary to $75,000 per year, explaining that Zeidler's financial condition required cost-cutting, but DeForge did not mention any dissatisfaction with Mickey's performance or reduction in his responsibilities. That same day, DeForge gave Rhein a $20,000 raise, increasing his salary from $80,000 to $100,000. In January 2000, DeForge again raised Rhein's salary to $125,000; Mickey's salary remained at $75,000.

In early 2002, DeForge, citing Zeidler's financial condition, reduced Mickey's pay from $75,000 to $70,000, and he reduced Rhein's salary from $125,000 to $100,000. Mickey claims that in 2002 and 2003, DeForge began inquiring into Mickey's plans for retirement. After their discussion in late 2003, Mickey presented a list of reasons to DeForge explaining his decision not to retire. At that point, DeForge significantly altered Mickey's terms of employment: effective January 1, 2004, he reassigned Mickey from an exempt salary status (at $70,000 per year) to a non-exempt $25.00 per hour status ($52,000 per year), rescinded all vacation and holiday pay benefits, and limited Mickey to a forty-hour workweek. DeForge claims that he told Mickey he was "part time," but Mickey does not recall any such statements. DeForge stated that he changed Mickey's status because the company was not doing well; at this same time in January 2004, DeForge raised Rhein's salary to $110,000 from $100,000.

Over the next several months in 2004, Mickey's pay stubs document that he continued regularly working a full forty-hour workweek. Mickey testified that his wife had a heart attack early

in 2004 and underwent emergency surgery.  After she returned to health, he decided to file a charge of discrimination with the EEOC.  EEOC records show that Mickey filed his charge on October 7, 2004, and that the EEOC sent a notice of Mickey's charge to Zeidler a week later on, October 14, 2004.  DeForge spent the days of October 15 to 18, 2004, at Limberlost Farms.

DeForge terminated Mickey's employment on the morning of Tuesday, October 19, 2004.  Mickey testified that when he arrived for work at 7:30 a.m. that morning, DeForge followed him into his office, told him that he was laid off, and that he should pack up his belongings.  When asked at his deposition whether he had seen Mickey's EEOC charge at that time, DeForge first responded that "I don't remember" before admitting that "I did see it." (Joint Appendix ("JA") 259.)  DeForge claimed that the EEOC charge was not a factor in his decision to terminate Mickey,  and that he "had made the decision over that [prior] weekend" while in northern Michigan.  (JA 254-55.)  The very day that he terminated Mickey, DeForge had his attorneys reply to Mickey's charges in a letter to the EEOC, which stated the company was not interested in mediating the case.

DeForge offered several reasons for his decision to terminate Mickey.  Specifically, he stated that the condition of the business, Mickey's performance, and the lack of available work for Mickey motivated his decision.  The financial documents DeForge claimed to have reviewed that weekend showed that Zeidler made a profit of nearly $330,000 over the first nine months of 2004, compared with a loss of approximately $410,000 in the same period of 2003.  DeForge also admitted that Zeidler was running help-wanted advertisements for various positions up to and after October 2004.  The advertised positions included jobs and duties that Mickey had performed earlier in his career, such as die maker or die leader, but DeForge testified that during Mickey's tenure as a supervisor he at some point lost these various skills, although DeForge could not pinpoint when this occurred.

On December 13, 2004, Mickey filed a charge of retaliation with the EEOC and filed his complaint in the Eastern District of Michigan on January 31, 2005, within ninety days of receiving a right-to-sue letter.  On June 12, 2006, the district court entered an opinion and order granting Zeidler's motion for summary judgment, and on July 10, 2006, Mickey filed a notice of appeal.

## II.

This Court reviews a district court's grant of summary judgment de novo. *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006).  Summary judgment is appropriate where the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In deciding an appeal of a grant of summary judgment, we view the evidence and draw all reasonable inferences in favor of [Mickey], the non-moving party." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## A.

The ADEA provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  Absent direct evidence of discrimination, a plaintiff claiming that he was unlawfully terminated in violation of the ADEA must establish a prima facie case of age discrimination by showing: (1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker. *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d

307, 317 (6th Cir. 2007).[1]  If Mickey meets his prima facie burden, the burden then shifts to Zeidler to articulate a legitimate, nondiscriminatory reason for the termination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If Zeidler articulates such a reason, the burden shifts back to Mickey to show that this reason is pretextual.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

On appeal, the only contested issue regarding Mickey's age discrimination claims is whether he satisfied the fourth element of the prima facie case, and the district court concluded that he had not.  We agree.  To establish the fourth element, Mickey needed to show either that Zeidler replaced him with a younger worker or, alternatively, that Zeidler treated similarly situated, non-protected employees more favorably.  *See Tuttle*, 474 F.3d at 317 ("The fourth element may be satisfied 'by showing that similarly situated non-protected employees were treated more favorably.'") (internal quotations and citation omitted).

As to the claim that Mickey was replaced by a younger worker, Mickey argues that "Patrick Rhein, 21 years younger than Mickey, assumed some of Mickey's duties in early 2004 and took over the remaining duties and General Manager position immediately upon Mickey's termination ten (10) months later." (Appellant's Br. 22); *see also Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) ("Age differences of ten or more years have generally been held to be sufficiently substantial to meet the requirement of the fourth part of age discrimination prima facie case.").  In his deposition, however, Mickey conceded that his primary duties in 2003 and 2004 consisted of doing estimating work for projects, and the affidavit of Robert Beilat, another older worker whose duties primarily involved estimating, noted that "[a]fter Mr. Mickey left Zeidler, I continued to do the estimating work with Mr. DeForge." (JA 178, 287.)  Rather than assign Mickey's duties to a significantly younger worker, Zeidler dealt with his departure by having two older employees assume his duties. As this Court stated in *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990), "a person is not replaced when . . . the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."  Further, even if Rhein assumed the title of General Manager, Mickey's former position, Mickey offered no evidence that Rhein assumed Mickey's estimating duties after his termination.  Indeed, Mickey's own testimony acknowledged that Rhein long ago assumed the management duties that Mickey had once performed as shop supervisor prior to 1992.  *See* (JA 284-85) ("Mr. Rhein at that time [1992] then was made the supervisor on the floor . . . generally controlling the whole operation.").

Mickey also argues that he established the fourth element of the prima facie case by showing that Zeidler treated Rhein more favorably in regards to salary and benefits, but this argument fails as well.  This Court has explained that in analyzing the treatment of similarly situated employees, the question is whether the plaintiff has "demonstrate[d] that he or she is similarly-situated to the non-protected employee in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998).  We do not require "the non-protected employee . . . to be identically situated to the plaintiff in every single aspect of their employment, [because] a plaintiff whose job responsibilities are unique to his or her position will *never* successfully establish a prima facie case (absent direct evidence of discrimination)." *Id.*  For the purposes of resolving an age-based wage discrimination claim under the ADEA, we find that the "the relevant factors include the skill, effort, and responsibilities of each job and the working conditions under which each job is performed." *Conti v. Universal Enter., Inc.*, 50 F. App'x 690, 699 (6th Cir. 2002).

---

[1] "Michigan courts have considered federal law when reviewing claims of age discrimination based on state law." *Featherly v. Teledyne Indus., Inc.*, 486 N.W.2d 361, 364 (Mich. Ct. App. 1992).

Although Zeidler offered a higher salary and more benefits to Rhein than it did to Mickey, Mickey himself testified that Rhein was "generally controlling the whole operation" after 1992, and that in the position of General Manager, Mickey "became less involved in running the shop." (JA 284-85.) Between 1992 and 2004, the evidence shows that Mickey and Rhein performed different roles in the company. As a shop supervisor, Rhein worked with customers, managed the supply base, and controlled the day-to-day operations of the business, which included the responsibility for hiring, firing, and disciplining other employees. (*Id.*) In contrast, as General Manager, Mickey became more involved in estimating and quoting work, and less involved in running the shop on a daily basis. (*Id.*) From this, we conclude that Mickey and Rhein were not similarly situated in all relevant respects.

## B.

The *McDonnell Douglas* framework governs claims of retaliation based on circumstantial evidence. To establish a prima facie case of retaliation, Mickey must show "(1) that [he] engaged in a protected activity; (2) that the defendant had knowledge of [his] protected conduct; (3) that the defendant took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002) (citing *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).[2]

The parties dispute only whether Mickey established the fourth element of his retaliation claim, a causal connection between his EEOC charge of discrimination filed on October 7, 2004, and his termination on October 19, 2004, the day that DeForge and Zeidler learned of Mickey's charge. The district court, relying on the proposition "that temporal proximity, standing alone, is not enough to allow a reasonable juror to conclude that [Zeidler] would not have laid off [Mickey] 'but for' his filing the EEOC charge," concluded that Mickey had not met his burden. (JA 203.) We disagree.

Although recent case law presents as settled the proposition that temporal proximity alone may not establish a causal connection, *see, e.g.*, *Tuttle*, 474 F.3d at 321 ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."), this issue deserves greater attention. The Court in *Tuttle* cited *Nguyen* to support its assertion that temporal proximity alone is not enough to establish causation, *id.*, but *Nguyen* made no such holding. *See also Dixon v. Gonzales*, 481 F.3d 324, 333-34 (6th Cir. 2007) (citing *Nguyen* for the same holding); *Randolph v. Ohio Dept. of Youth Serv.*, 453 F.3d 724, 737 (6th Cir. 2006) (same); *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001) (same).

*Nguyen* noted that "while there may be circumstances where evidence of temporal proximity alone *would* be sufficient to support [the] inference [of retaliatory discrimination], we do not hesitate to say that they have not been presented in this case." 229 F.3d at 567 (emphasis added). Although *Nguyen* did however note that other earlier cases could be read as having "rejected the proposition that temporal proximity is enough," *id.* at 566 (citing *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986), *Nguyen* reads these cases expansively, and none squarely stands for the

---

[2]Although Michigan courts assess claims of retaliation under the ELCRA using the same general framework as that used by federal courts, *see West v. General Motors Corp.*, 665 N.W.2d 468, 471-73 (Mich. 2003) (citing federal cases), the standard for causation is higher. The Michigan Court of Appeals has held that "[t]o establish causation, the plaintiff must show that his participation in activity protected by the [EL]CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001).

proposition that temporal proximity alone may never show a causal connection. In *Cooper*, for example, this court simply stated that "[t]he mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation." 795 F.2d at 1272. That language does not preclude plaintiffs from ever using a temporal proximity closer than four months to establish an inference of retaliation.[3]

After *Nguyen*, other cases confronting this issue have often included statements similar to *Nguyen*'s suggestion that in some circumstances "temporal proximity alone would be sufficient." 229 F.3d at 567. For instance, in *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), this Court stated that "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *See also Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) ("Temporal proximity can establish a causal connection between the protected activity and the unlawful employment action in the retaliation context."); *McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 965 (6th Cir. 2004) (finding causation when "only 13 days" separated protected activity from adverse action, reasoning that an "employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation where the particular circumstances strengthen the inference of causation"); *Shefferly v. Health Alliance Plan of Michigan*, 94 F. App'x 275, 285 (6th Cir. 2004) (stating that "the passage of less than three weeks between [the employer's] receipt of the charges and the adverse actions gives rise to an inference of discrimination" and "[t]herefore, in this case, [the plaintiff] has established a prima facie case of retaliation"); *Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 472-73 (6th Cir. 2002) ("[T]he fact that retaliation occurs 'very close' in time after a person engages in conduct protected by Title VII may suffice to satisfy the causal connection requirement.") (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)). Furthermore, one could read the Supreme Court as having accepted that temporal proximity may be sufficient in a narrow set of cases. *See Clark County*, 532 U.S. at 273 (referencing "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case" and noting that those cases "uniformly hold that the temporal proximity must be 'very close'") (citations omitted).

Although we acknowledge, as one district court recently noted, that some "confusion in the case law [exists] on this issue," *Eppes v. Enter. Rent-A-Car Co.*, No. 3:05-CV-458, 2007 WL 1170741, at *7 (E.D. Tenn. April 18, 2007), the two lines of cases are fully reconcilable. Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. *See Little*, 265 F.3d at 365 ("[T]emporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection.).

---

[3] Likewise, *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999), cited in *Nguyen*, does not preclude possibility that temporal proximity may suffice in some cases. The *Moore* Court simply stated that "[t]he causal connection . . . may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint [with the EEOC] and by showing that he was treated differently from other employees." 171 F.3d at 1080. Although *Parnell v. West*, No. 95-2131, 1997 WL 271751, at *2 (6th Cir. May 21, 1997) (unpublished), the last case cited in *Nguyen*, does contain language flatly stating that temporal proximity alone is insufficient to show a causal connection, it noted that "previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months." *Id.* at *3. Thus, none expressly foreclose plaintiffs from ever establishing a causal connection purely through temporal proximity.

The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action. Moreover, such a holding would accord with cases from other circuits, which recognize that, in rare cases, temporal proximity alone may suffice to show a causal connection. *See Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[M]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001) (stating that "[u]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation," and noting that a prior case "'held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation'") (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)); *Cardenas v. Massey*, 269 F.3d 251, 264 (3d Cir. 2001) ("[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not unusually suggestive.") (internal quotations and citation omitted).

With these principles in mind, and turning to the case at hand, we find that Mickey has met his burden. When Mickey arrived for work on the morning of October 19, 2004, the very day that DeForge learned of Mickey's EEOC charge, DeForge followed him into his office, told him that he was laid off, and that he should pack up his things. In those limited number of cases–like the one at bar–where an employer fires an employee immediately after learning of a protected activity, we can infer a causal connection between the two actions, even if Mickey had not presented other evidence of retaliation. *Cf. Nguyen*, 229 F.3d at 563 ("The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met."). But even assuming that close temporal proximity by itself is not enough to establish causation for the purposes of a retaliation claim, the reduction in Mickey's salary and benefits in 2004, along with DeForge's occasional inquiries regarding Mickey's retirement plans, constitute sufficient additional circumstantial evidence. Admittedly, such other evidence of retaliatory conduct has commonly included evidence of additional discrimination occurring between the date at which the employer learned of the protected activity and the date of termination or other adverse employment action. However, unlike most plaintiffs, Mickey is unable to couple temporal proximity with any such other evidence of retaliation because his employer *immediately* retaliated against him upon learning of his protected activity. Thus, although these events occurred prior to his protected conduct, a reasonable juror could conclude that Zeidler's actions, coupled with exceptionally close temporal proximity, demonstrate an underlying bias that tends to prove the later termination involved retaliatory discrimination.

Because Mickey has established a prima facie case, under the *McDonnell Douglas* framework "the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times." *Weigel*, 302 F.3d at 377-78 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant articulates such a reason, the plaintiff may then show that the defendant's stated reason "is merely a pretext for discrimination." *Id.* at 378. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). The "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants . . . did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (internal quotations and citations omitted). To show an honest belief, "the

employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998).

Zeidler advances three non-discriminatory reasons for its decision to terminate Mickey, but Mickey has succeeded in putting forth evidence from which a reasonable jury could conclude that Zeidler did not act "in reasonable reliance" on the "particularized facts" relating to its asserted reasons. Zeidler's three asserted reasons were legitimate business reasons, including the condition of the business, Mickey's performance, and the lack of available work. DeForge also testified that he had spent the weekend pondering the business and that "I had made the decision over that weekend." (JA 254-55.)

Mickey presented ample evidence to permit a reasonable jury to conclude that Zeidler's reasons and DeForge's claim to have made his decision over the weekend were merely a pretext for retaliating against Mickey's protected conduct. Zeidler's first asserted reason is the condition of the business, but Zeidler's records show that 2004 marked a substantial upswing in Zeidler's business condition. According to records that DeForge claimed to have reviewed in October 2004, the first nine months of 2004 saw Zeidler earn a profit of roughly $330,000, compared to a loss of approximately $410,000 in the same period of 2003. Zeidler emphasizes that the company "had endured three years of losses, and many painful steps had been taken in an effort to keep the Company afloat." (Appellant Br. 28.) But taking the drastic step of laying off a thirty-three year employee just when the company begins to show a substantial profit has "little basis in fact" given that business conditions had materially improved. Further, this Court has noted that "summary judgment is not appropriate every time an employer offers this 'business judgment' rationale" and that "facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (internal quotations and citation omitted).

Zeidler's second asserted reason, relating to alleged deficiencies in Mickey's performance, has no basis in the record. Because Zeidler did not keep detailed personnel records, Mickey's personnel file lacks any record of negative evaluations, and, to the contrary, the records show fairly regular raises. Further, although DeForge testified that he felt that Mickey's work ethic had declined and that he spoke about his concerns with Mickey, Mickey testified that he did not recall any such discussions. Given this conflicting evidence, Mickey presented sufficient rebuttal evidence to render this issue a question for a jury.

Zeidler's final asserted non-discriminatory reason was the dwindling availability of work for Mickey to perform, and again Mickey has presented sufficient evidence to render this reason unworthy of credence. Zeidler admitted to running several advertisements seeking additional employees to perform jobs that it conceded Mickey was once qualified to perform.

Other evidence also supports viewing Zeidler's asserted reasons as mere pretext. When asked at his deposition whether any considerations beyond the three discussed above motivated his decision to terminate Mickey, DeForge said "no." (JA 259.) In response to the very next question asked, "[i]sn't it true, sir, that you had received [Mickey's] EEOC charge at that time," DeForge initially responded "I don't remember." (*Id.*) When Mickey's attorney asked a follow-up question, "[i]s it your sworn testimony that you don't recall seeing the EEOC charge before terminating Mr. Mickey?" DeForge conceded that he had seen it, answering "No. I did see it." (*Id.*) Thus, in the context of questions probing his motives for terminating Mickey, DeForge initially sought to avoid admitting that he knew about Mickey's EEOC charge on the day he terminated him. DeForge admitted the truth only when pressed whether his "sworn testimony" was that he had not seen the EEOC charge letter. Furthermore, as to DeForge's initial assertion that he did not remember whether he had seen the charge that day, the record demonstrates that the very day that he terminated

Mickey, October 19, 2004, DeForge had his attorneys reply to Mickey's charges in a letter to the EEOC. Such inconsistency and evasiveness seem to be the epitome of pretext meant to mask retaliatory discrimination, at the very least raising a factual question for a jury to resolve.

Finally, as to Mickey's retaliation claim under the ELCRA, which requires showing that the plaintiff's protected activity was a "significant factor" in the employer's adverse action, this Court has held that "a plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *In re Rodriguez*, 487 F.3d 1001, 1011 (6th Cir. 2007) (internal quotations and citation omitted). Given the temporal simultaneity in this case, combined with Mickey's evidence of pretext rebutting Zeidler's asserted non-discriminatory reasons for terminating him, Mickey has met this standard as well and that his claim raises questions of fact for a jury to resolve. Accordingly, we conclude that Mickey has established a prima facie case as to both his federal and state retaliation claims and has rebutted Zeidler's asserted non-discriminatory reasons for his termination with evidence of pretext.

### III.

For the reasons discussed above, we AFFIRM the district court's grant of summary judgment to Zeidler on Mickey's age discrimination claims under the ADEA and ELCRA; REVERSE the district court's grant of summary judgment to Zeidler on Mickey's retaliation claims; and REMAND the case for further proceedings consistent with this opinion.

---
**CONCURRENCE**
---

ALICE M. BATCHELDER, Circuit Judge, concurring. I join in all but section II(B) of the lead opinion. While I join in the result the opinion reaches in section II(B) — namely, that an employer's firing an employee within minutes of learning of the employee's protected activity is enough to establish a prima facie case of retaliation — I write separately for two reasons. First, I cannot agree with the lead opinion's reading of this circuit's precedents on the question of whether "temporal proximity" alone can satisfy the causal connection prong of the *McDonnell Douglas* framework. Second, I cannot agree that actions an employer took not only prior to learning of the employee's protected activity — but also prior to the protected activity itself — can possibly amount to evidence of retaliation.

The lead opinion takes an expansive view of the precedent in this circuit. In *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000), a case in which we affirmed the district court's determination that the plaintiff had not established a prima facie case of retaliation, we stated in dicta that "while there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an inference of a causal link], we do not hesitate to say that they have not been presented in this case." Then, the majority in *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004), seized upon that dicta, along with several unreported cases — which have no precedential value — to claim that we "have embraced the premise that in certain distinct cases" the time between the protected activity and the adverse employment action is so brief that it "is deemed indirect evidence such as to permit an inference of retaliation to arise," 358 F.3d at 421, and to hold that "[i]n light of our prior precedent the temporal proximity between the two events [2 weeks] is significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive." *Id*. at 422. In fact, however, until *DiCarlo* we had never held that temporal proximity, standing alone, satisfies the fourth prong of the *McDonnell Douglas* analysis. *See Asmo*, 471 F.3d at 598-601 (J. Griffin, dissenting) (explaining the development of the precedent in this circuit).

There is another line of cases in this circuit, indeed the great majority of cases, standing for the proposition that temporal proximity alone is *not* sufficient to establish a causal connection for a retaliation claim. *See e.g. Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007); *Randolph v. Ohio Dept. of Youth Serv*, 453 F.3d 724, 737 (6th Cir. 2006); *Little v. BP Exploration &Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001). Those cases required other evidence of retaliatory conduct, in addition to temporal proximity, to demonstrate a causal connection. *See Tuttle*, 474 F.3d at 321 (citing *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). But we have never — at least in a published opinion — dealt with a case like the one before us here. *Nguyen* should be read as leaving the door open very slightly for a finding that in a case in which the employer's learning of the protected activity is so closely followed by the employer's taking of an adverse action that the two are virtually contemporaneous — exactly the circumstances in this case — the temporal proximity between the two is alone sufficient to establish the causal connection necessary for the fourth prong of a prima facie case of retaliation.

As the lead opinion points out, upon arriving at Zeidler Tool & Die on the morning of October 19, 2004, DeForge learned of Mickey's EEOC complaint. When Mickey arrived at 7:30 a.m., DeForge immediately fired him. There was virtually no time between these two events for DeForge to engage in any other conduct that would demonstrate any retaliatory motive or intent. Hence, Zeidler "ironically [has] a stronger defense than those who delay in taking adverse retaliatory action." Lead opinion at 7. In this factually unusual case, the extremely close temporal proximity

between these events does permit an inference that DeForge fired Mickey because of Mickey's protected activity.

Realizing that our precedent suggests that temporal proximity is not enough to establish the fourth prong of a prima facie case of retaliation, the lead opinion attempts to supply additional evidence of retaliation in the form of actions taken by DeForge before Mickey filed his EEOC claim. Specifically, the opinion states:

> [E]ven assuming that close temporal proximity by itself is not enough to establish causation for the purposes of a retaliation claim, the reduction in Mickey's salary and benefits in 2004, along with DeForge's occasional inquiries regarding Mickey's retirement plans, constitute sufficient additional circumstantial evidence to establish a prima facie case.

Lead opinion at 7. Apparently recognizing the logical fallacy of using as evidence of retaliation events that preceded the act allegedly prompting the retaliation, the opinion declares that "although these events occurred prior to [Mickey's] protected conduct, a reasonable juror could conclude that Zeidler's actions, coupled with exceptionally close temporal proximity, demonstrate an underlying bias that tends to prove the later termination involved retaliatory discrimination." The opinion cites no authority in support of this proposition, and I must respectfully disagree with it.

"Retaliate," according to Merriam-Webster's Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/retaliate (last visited January 24, 2008), is either a transitive verb meaning "to repay (as an injury) in kind," or an intransitive verb meaning "to return like for like; *especially*: to get revenge." One cannot repay or act in response to or get revenge for something that has not yet happened. No reasonable juror could conclude that DeForge intended to retaliate against Mickey for his filing the EEOC charge before he was aware that Mickey had done so, let alone before Mickey had undertaken the protected activity in the first place, and therefore, DeForge's actions prior to Mickey's filing of the EEOC charge cannot be evidence of retaliation for that protected activity. This evidence is immaterial to Mickey's retaliation claim and cannot be used to support it.

I concur in the lead opinion's conclusion that Mickey has presented sufficient evidence of retaliation to survive summary judgment, but I would simply hold that the unique circumstances of this case — DeForge's firing Mickey immediately after learning that Mickey had filed an EEOC charge — suffice to establish the causal connection prong of Mickey's prima facie case. I cannot agree that the actions DeForge took before Mickey filed his EEOC charge, upon which the lead opinion relies, are material or relevant to this claim.