RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0012p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
─────────────────

SCOTT E. GAMMONS,

        *Plaintiff-Appellant*,

    *v.*

ADROIT MEDICAL SYSTEMS, INC.; GRAZYNA H. GAMMONS; KELLEY PATTEN; GENE GAMMONS,

        *Defendants-Appellees*.

No. 23-5374

─────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:21-cv-00173—Thomas A. Varlan, District Judge.

Argued: December 7, 2023

Decided and Filed: January 22, 2024

Before: WHITE, THAPAR, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** John M. Lawhorn, FRANTZ, MCCONNELL & SEYMOUR, LLP, Knoxville, Tennessee, for Appellant. W. Edward Shipe, BROCK SHIPE KLENK PLC, Knoxville, Tennessee, for Appellees. **ON BRIEF:** John M. Lawhorn, Sharon H. Kim, FRANTZ, MCCONNELL & SEYMOUR, LLP, Knoxville, Tennessee, for Appellant. W. Edward Shipe, Avery C. Lovingfoss, BROCK SHIPE KLENK PLC, Knoxville, Tennessee, for Appellees.

    BLOOMEKATZ, J., delivered the opinion of the court in which WHITE and THAPAR, JJ., joined. THAPAR, J. (pp. 14–15), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

BLOOMEKATZ, Circuit Judge.  The legal questions in this appeal arise from a bitter fight pitting a son against his father and stepfamily over a family business.  Scott Gammons claims that Adroit Medical Systems, Inc., Grazyna Gammons (his stepmother), Kelley Patten (his stepsister), and Gene Gammons (his father) (collectively, the defendants) diverted company funds for Grazyna and Kelley's personal benefit without accounting for the tax consequences.  According to Scott, the defendants fired him because he reported their alleged financial malfeasance to the Internal Revenue Service.  He further claims that if the defendants are not removed from the business, they will continue misappropriating company funds.  Scott brought an action seeking recovery under federal and state whistleblower statutes and state common law.  The district court granted the defendants summary judgment on all five of his claims, reasoning that Scott had obtained a legally baseless emergency conservatorship over Gene and used it to mount a corporate takeover.  After the defendants regained control of the family business, that coup—irrespective of any whistleblowing—motivated their decision to fire Scott, defeating Scott's claims as a matter of law.  We affirm.

**BACKGROUND**

Scott's relationship with Adroit began 29 years before the events of March 2020.  Gene made Scott a 20% shareholder when he started Adroit, an ownership interest Scott still holds today.  Gene retained the other 80% and served as the company's president. Scott served on the board and worked at Adroit.  Before his firing, Scott's day-to-day responsibilities at Adroit "included sales and marketing, social media, product development, patents and trademarks, supplier and distribution agreements, regulatory compliance, and exports."  R. 42-1, PageID 473.

According to Scott, he noticed a decline in Gene's health and capacity to run the business sometime in early 2019.  Others in the family noticed too, so Grazyna and Kelley took over more of Adroit's day-to-day operations.  By July 2019, Scott became suspicious of charges Grazyna and Kelley were authorizing for themselves as company expenses—expenses that none of the

defendants reported as Grazyna and Kelley's taxable income. He claims that when he examined company financial records, including expense reimbursements, he found payments to personal credit cards and company employees for non-company labor dating back to 2017. Scott concluded that Grazyna and Kelley were committing tax fraud, theft, and embezzlement. In January 2020, Scott provided company documents to the IRS that he believed incriminated Grazyna and Kelley. It is undisputed that none of the defendants knew what Scott was doing at that time.

On March 4, 2020, Adroit sent out a notice informing its shareholders that the board would vote on Grazyna assuming the office of president the following week. Grazyna's succeeding Gene as company president mirrored Gene's wish that she manage his affairs in the event of his incapacity, as expressed in his durable power-of-attorney documents. That same day, Scott filed an emergency petition to be designated as Gene's conservator in Loudon County, Tennessee probate court. Scott's conservatorship petition accused Grazyna and Kelley of taking advantage of Gene and asked the probate court to give him control over Gene's business affairs. The probate court granted Scott's emergency conservatorship petition ex parte on March 5 and scheduled a follow-up hearing for March 10.

By combining his 20% stake in Adroit and Gene's 80% controlling interest, Scott's conservatorship power over Gene allowed him to act unilaterally. Scott quickly used his absolute power to add his allies (including his brother Jeff) to the board of directors and oust Grazyna. He also suspended Grazyna and Kelley's employment, changed the locks at Adroit's offices, and informed the employees that he was in charge. On March 7, Scott also informed Grazyna, Kelley, and Gene of his conservatorship power and told them that they were under IRS investigation. IRS agents searched Adroit's offices the following Monday and took a hard drive to complete a company financial audit.

But on March 10, Scott's takeover ended. The probate court dissolved Scott's power as emergency conservator over Gene, finding that Gene was not disabled under Tennessee law and citing Gene's long-established wish that Grazyna act on his behalf should he become disabled. In ruling on the matter, the probate court explicitly stated that Scott, in seeking the conservatorship, "wasn't trying to act in his dad's best interest." R.23-3, PageID 228.

As soon as he regained his controlling interest in the company, Gene appointed a new board of directors to replace the existing Scott-controlled board.  At the March 11 shareholder meeting, the reconstituted board of directors, which included Grazyna and Kelley, voted to terminate both Scott and Jeff's employment for cause.

In his complaint, Scott alleged that the defendants violated the Taxpayer First Act, 26 U.S.C. § 7623(d), and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, by terminating him for reporting their financial misdeeds to the IRS.  Scott also advanced claims for intentional interference with at-will employment, intentional interference with prospective economic advantage, and civil conspiracy against Grazyna, Kelley, and Gene in their personal capacities.  The defendants moved for summary judgment, arguing that they terminated Scott for his hostile takeover of the company and that they acted within their corporate capacities in terminating him.  The district court granted the defendants' motion on all counts.  Scott now appeals.

**STANDARD OF REVIEW**

Summary judgment is appropriate where the evidence presents no genuine dispute of material fact such that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Federal courts must draw all reasonable inferences in favor of the non-moving party in evaluating a motion for summary judgment.  *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004).  We review de novo the district court's grant of summary judgment. *Levine v. DeJoy*, 64 F.4th 789, 796 (6th Cir. 2023).  And we may affirm on any grounds supported by the record, even if they are different from the grounds the district court relied upon in reaching its summary judgment decision below.  *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994).

**ANALYSIS**

**I.  Taxpayer First Act**

The Taxpayer First Act (TFA) makes it unlawful for an employer to discharge an employee in reprisal for providing information "the employee reasonably believes constitutes a

violation of the internal revenue laws or any provision of Federal law relating to tax fraud" to the IRS. 26 U.S.C. § 7623(d)(1).  The plain text of the statute provides that the two-part burden-shifting framework set forth in 49 U.S.C. § 42121(b)(2)(B) applies to TFA claims. *See* 26 U.S.C. § 7623(d)(2)(B)(iii).[1]

Under this standard, Scott has to first establish a prima facie case by presenting evidence that satisfies the following elements: (1) he engaged in protected conduct; (2) the defendants knew of his protected conduct; (3) the defendants subjected him to an adverse employment action; and (4) his protected conduct was a "contributing factor" when the defendants subjected him to the adverse employment action.  49 U.S.C. § 42121(b)(2)(B)(i); *Weatherford U.S. v. Dep't of Labor*, 68 F.4th 1030, 1039–40 (6th Cir. 2023).  Scott's prima facie burden is "much easier" to satisfy than the burden faced by a *McDonnell Douglas* plaintiff.  *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 159 (3d Cir. 2013).  Second, even if the evidence allows Scott to carry his prima facie burden, the defendants may still defeat the TFA claim by identifying "clear and convincing evidence" that they would have fired Scott even if he had not reported them to the IRS.  *Id.* (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)).

Given that we frequently apply the *McDonnell Douglas* burden-shifting framework to retaliation claims, the parties and district court concluded that the same standard should apply to TFA claims, albeit with some modifications for the "contributing factor" and "clear and convincing" language in § 42121(b)(2)(B).  But after this appeal was filed, we explained in *Weatherford v. U.S. Department of Labor* that the two-step burden-shifting framework for statutes incorporating § 42121(b)(2)(B) is "statutorily required" and not interchangeable with the three-step *McDonnell Douglas* burden-shifting framework.  68 F.4th at 1040.  Although *Weatherford* analyzed a different statute that incorporates the § 42121(b)(2)(B) standard, its reasoning governs TFA claims too.  So we proceed by applying the two-part § 42121(b)(2)(B) burden shifting standard.

---

[1]The TFA states: "[a]n action under subparagraph (A)(ii) shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code."  26 U.S.C. § 7623(d)(2)(B)(iii).

## A. Scott satisfied the contributing factor element and made a prima facie case of TFA retaliation.

No party disputes that Scott satisfied the first three elements of his prima facie burden, so we begin by analyzing Scott's showing on the contributing factor element. Unlike the *McDonnell Douglas* standard, for a TFA claim Scott does not have to prove his protected conduct was a significant, motivating, substantial, or predominant factor in the adverse personnel decision. *Weatherford*, 68 F.4th at 1041; *Consol. Rail Corp. v. U.S. Dep't of Lab.*, 567 F. App'x 334, 338 (6th Cir. 2014); *Araujo*, 708 F.3d at 158. Rather, Scott may satisfy his burden with evidence of retaliation, which, alone or in connection with other factors, tended to affect the defendants' decision to fire him. *Weatherford*, 68 F.4th at 1041 (quotations omitted).

Scott primarily relies upon the compact timeline to demonstrate that reporting his stepfamily to the IRS was a "contributing factor" in his termination. And we agree. The defendants learned of Scott's protected activity (calling the IRS) on March 7—just four days before they fired him. At the time the defendants first learned of Scott's IRS reports, they did not have the ability to fire him. Recall that Scott then had complete control over Adroit as Gene's emergency conservator. And the defendants only regained control over Adroit on March 10, after the Tennessee probate court dissolved Scott's emergency conservatorship. The very next day, Gene appointed a new board that subsequently voted to fire Scott. So, the defendants fired Scott as soon as they possibly could after learning of his IRS reports. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 665 (6th Cir. 2020) ("[A] court may still draw an inference of causation where the defendant took advantage of its first meaningful opportunity to retaliate against the plaintiff."). Scott's temporal proximity evidence is sufficient to carry his burden on the contributing factor element.

The district court's conclusion that Scott failed to satisfy the "contributing factor" element was based on its view that, under our precedents, a plaintiff may never meet his or her prima facie obligation by relying exclusively on temporal proximity evidence. This was error. In the more stringent *McDonnell Douglas* context, we have held in rare cases that a plaintiff can satisfy the contributing factor prong based solely on the temporal proximity between the protected activity and the adverse action. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525

(6th Cir. 2008); *accord id.* at 529 (Batchelder, J., concurring). The purpose of this rule is to allow an employee to recover against an employer who unlawfully retaliates "swiftly and immediately upon learning of protected activity." *Mickey*, 516 F.3d at 525. It follows that under the less burdensome § 42121(b)(2)(B)(i) standard, a plaintiff may also satisfy the contributing factor element using temporal proximity evidence, at least in certain cases. Indeed, the fact that the defendants fired Scott at their first meaningful opportunity—which was only four days after learning of the protected activity—would establish a causal connection in a *McDonnell Douglas* case; it is sufficient to make the same required showing under § 42121(b)(2)(B)(i). *See Mickey*, 516 F.3d at 523 ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."); *see also id.* (citing *McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 965 (6th Cir. 2004) (plaintiff's burden to establish a causal connection satisfied with a 13-day gap)). Therefore, Scott qualifies as a "rare" TFA plaintiff who may rely on temporal proximity to satisfy his causal connection burden. *Mickey*, 516 F.3d at 525.

Moreover, the record contains additional evidence that helps Scott satisfy the contributing factor element. When Scott told Grazyna that the IRS was investigating her for theft, embezzlement, and income tax violations, Grazyna allegedly responded "yes, it is very serious," indicating that she was concerned about the prospect of an investigation. R. 42-1, PageID 486. IRS agents also showed up at Adroit's offices, copied Kelley's hard drive, and searched Adroit's business records. It would be reasonable to infer that when Adroit fired Scott, the reconstituted board—which included Grazyna and Kelley—were angry that Scott placed them under the IRS's scrutiny, motivating their decision to terminate his employment.

### B. The defendants defeated Scott's TFA claim with clear and convincing evidence that they would have fired Scott in the absence of his IRS reports.

Because Scott established a prima facie case, we move to the second and final step under the statutory burden-shifting framework, where the onus moves to the defendants. The defendants may defeat Scott's TFA claim by supplying "clear and convincing evidence" that they would have fired Scott even if he had not reported them to the IRS. 49 U.S.C.

§ 42121(b)(2)(B); *Weatherford*, 60 F.4th at 1039–40; *see, e.g.*, *Hoffman v. Solis*, 636 F.3d 262, 272 (6th Cir. 2011) (affirming an agency finding that a defendant-employer would have declined to promote the plaintiff-employee even in the absence of his protected activities). Clear and convincing is a high burden, but the defendants meet it here by producing overwhelming and uncontroverted evidence that they terminated Scott "because of his attempted coup" that he staged using the emergency conservatorship over Gene. [App. R. 24, PageID 45.]

The record demonstrates that the defendants would have made the decision to terminate Scott even without his reports to the IRS. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 793 (8th Cir. 2014). The attempted coup itself sufficiently motivated the defendants to get Scott out of the business; the IRS reporting was just icing on the cake. Tellingly, the defendants fired Scott's brother Jeff—who was not involved in the IRS reporting—for simply acting as an accomplice in Scott's scheme.

Scott's emergency conservatorship was nothing short of manipulating a legal process to effectuate a hostile takeover. Imposing a conservatorship has serious consequences, as the person faces a substantial loss of freedom. *See In re Conservatorship of Groves*, 109 S.W.3d 317, 329 (Tenn. Ct. App. 2003). The purpose of a conservatorship is not to protect corporate assets; rather, the proceeding is "intended to promote the best interests of the vulnerable elderly." *Id.* Yet, by his own admission, Scott filed his conservatorship petition to stop Grazyna and Kelley from utilizing Adroit's corporate assets in a manner he found objectionable. The petition did not even mention Gene's personal affairs or discuss Gene's day-to-day well-being. But Scott's desire to control Adroit's corporate assets, standing alone, does not provide a legitimate legal basis to impose a conservatorship on Gene. And Gene had already decided that he wanted Grazyna to "take care of his business ventures," as evidenced by his granting her his durable power of attorney and making her his successor as president, so Scott flouted his wishes. R. 23-3, PageID 224. Unsurprisingly, the probate court found that Scott "wasn't trying to act in his dad's best interest," and instead had filed the petition to prevent his father from granting his step-relatives control of Adroit. *Id.* at PageID 228.

Once obtaining power over the company, Scott immediately forced his stepfamily out. Not only did he fire Grazyna and Kelly and remove them from the board, but he also physically

locked them out of the building. When Scott's scheme failed, who wouldn't think that he would be fired? Even Scott recognized that there was no way for him to coexist with Gene, Grazyna, and Kelley after initiating his conservatorship maneuver. Clear and convincing evidence shows that the defendants would have fired Scott even without his reporting anything to the IRS.

Attempting to salvage his TFA claim, Scott characterizes his conservatorship petition and his IRS reporting as "significantly related," so that it would be impossible to say that he was fired for one act and not the other. Appellant Br. at 39. But his conservatorship petition—which is not a protected activity—was distinct from his IRS reporting, which is. And Scott had already reported the alleged misdeeds to the IRS by the time he filed for the conservatorship, so his hostile takeover had nothing to do with an effort to aid in the agency's investigation. Indeed, even if Scott were concerned that Gene did not recognize Grazyna and Kelley's alleged financial misdeeds, imposing a conservatorship and usurping Adroit's corporate power went far beyond exposing their alleged fraud. Scott, therefore, fails to counter the defendants' clear and convincing evidence that they would have fired him even if he hadn't reported them to the IRS.

## II. Tennessee Public Protection Act

Like the TFA, the Tennessee Public Protection Act (TPPA) protects employees who "refus[e] to participate in or . . . refus[e] to remain silent about illegal activities" at their workplace. Tenn. Code Ann. § 50-1-304(b) (punctuation omitted). The Tennessee Supreme Court has held that a modified version of the *McDonnell Douglas* framework applies to TPPA claims. *Williams v. City of Burns*, 465 S.W.3d 96, 111–12 (Tenn. 2015). Relevant here, the TPPA is more stringent than *McDonnell Douglas* because it requires the plaintiff to show that unlawful retaliation was the sole reason for the termination. *Id*. at 110–11.

### A. Scott presented a prima facie case of TPPA retaliatory discharge.

At the prima facie stage, Scott had to present evidence satisfying the following elements: (1) he was an Adroit employee; (2) he refused to participate in or remain silent about illegal activity; (3) Adroit terminated his employment; and (4) there was a sufficient causal connection between Scott's protected conduct and his discharge. *Id.* at 113–14. Like Scott's TFA claim, only the fourth element is in dispute, and, as noted above, the district court concluded that the

only evidence connecting the defendants' knowledge of Scott's IRS reporting to his termination was temporal proximity.  Unlike the federal claim, however, under Tennessee law a TPPA plaintiff cannot rely exclusively on temporal proximity to satisfy his or her prima facie burden. *Boyd v. Youth Opportunity Invs.*, No. 3:20-cv-321, 2022 WL 3205013, at *9 (E.D. Tenn. Aug. 8, 2022) (citing *Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn. 1997)).

But that is not fatal to Scott's prima facie case, especially given that at this stage we must view the record in the light most favorable to Scott's claim that his protected activity motivated his discharge.  In addition to temporal proximity, the record contains evidence (discussed above) supporting the reasonable inference that retaliation played into the defendant's decision to fire him.  The defendants thought Scott's IRS reports were "very serious" and then experienced an unannounced IRS raid of their offices, where the IRS copied Kelly's hard drive for a thorough audit.  R. 42-1, PageID 486–87.  That evidence is sufficient to support an inference of a causal connection between his protected activity and his discharge.

**B.  The defendants produced a non-retaliatory reason for Scott's discharge.**

Moving to the defendants' obligation to set forth a non-retaliatory reason for Scott's termination, they easily satisfy their burden.  The defendants' claimed basis for Scott's discharge is his emergency conservatorship and hostile takeover of Adroit.  *See* Tenn. Code Ann. § 50-1-304(f) (discussing a TPPA defendant's burden to produce evidence of a legitimate, nondiscriminatory reason for the plaintiff's discharge).  And if the conservatorship holds up as a legitimate part of the defendants' decision to fire Scott, that's enough to show that they did not fire him solely for engaging in protected activity—even assuming his protected activity factored into the termination decision.  Tenn. Code Ann. § 50-1-3-4(b); *Jones v. City of Union City*, No. 2013-02358-COA-R3-CV, 2015 WL 9257815, at *6–7 (Tenn. Ct. App. Dec. 17, 2015) (explaining that the TPPA's sole causation element has an important impact after the prima facie stage).  Accordingly, Scott must prove that the conservatorship reason was a mere pretext for the defendants to retaliate against him for his IRS reports.  Tenn. Code Ann. § 50-1-3-4(f) (allowing a TPPA plaintiff to negate the defendant's basis for termination with evidence that basis was pretextual).

**C. Scott failed to offer an evidentiary basis to support the inference that the defendants' legitimate reason for terminating him was pretext.**

There are three routes for Scott to show that the defendants' claimed reason for terminating him was pretextual. He can show (1) his emergency conservatorship and takeover have no basis in fact; (2) his emergency conservatorship and takeover did not actually motivate the termination; or (3) his emergency conservatorship and takeover are insufficient to explain the termination. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012); *Walls v. Tenn. CVS Pharmacy*, 21 F. Supp.3d 889, 899 (M.D. Tenn. 2014). Scott acknowledges that he filed for a conservatorship over Gene and took temporary control over Adroit, so the first route is unavailable. To prevail on the third option, Scott must show that other employees "were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of" Scott. *Blizzard*, 698 F.3d at 286–87 (citation omitted). The evidence here shows the opposite; as discussed, the defendants fired his brother Jeff (who did not report anything to the IRS) because Jeff "engaged in substantially identical conduct"—participating in Scott's takeover attempt. *Walls*, 21 F. Supp.3d at 899 (quoting *Blizzard*, 698 F.3d at 286–87). As with Jeff, the takeover alone is enough to explain Scott's termination.

That leaves the second option, which also fails because Scott cannot prove that the conservatorship petition was not actually a reason for his termination. Scott points to two categories of evidence to support his view that this reason is pretextual, but neither is availing.

*First*, he claims that the defendants knew that he was trying to take over the company as early as January 2020 but did nothing until they learned of his IRS reports, undermining the defendants' contention that corporate overthrow—rather than IRS reporting—motivated his termination. But Scott didn't have the means to take over Adroit at that time. It wasn't until March 2020, when Scott filed the conservatorship petition, that his opportunity to take over materialized. So evidence from before he filed the petition cannot show pretext here.

*Second*, Scott theorizes that in March 2020, once the defendants found out about his IRS reports and conservatorship petition, his firing was motivated by the former to the exclusion of the latter. However, nothing in the record supports that assertion. All the defendants' statements

mention firing Scott within the context of dissolving the conservatorship petition and regaining control of the company. Even the private text messages between family members before Scott's firing are devoid of any reference to his IRS disclosures. The most favorable construction of the evidence shows that the defendants may have considered Scott's IRS reports *together* with his conservatorship petition. That's not enough to show that Scott's protected activity "was the only reason for the termination." *Williams*, 465 S.W.3d at 110–11 (internal quotation marks and citation omitted). Therefore, Scott's TPPA claim cannot survive the defendants' motion for summary judgment.

## III. Tennessee Common Law Claims

Scott also advances Tennessee common law claims for intentional interference with at-will employment, intentional interference with prospective economic advantage, and civil conspiracy against Grazyna, Kelley, and Gene in their personal capacities. Each of these claims relies on the theory that the individual defendants acted outside Adroit's corporate interest in pursuing Scott's termination. But the individual defendants are protected by the doctrine of intracorporate immunity because they did not fire Scott to further their own interests, which dooms Scott's common law claims.

Under Tennessee law, officers, directors, or employees of a corporation are immune from tortious interference claims so long as they acted within the scope of their authority and in furtherance of corporate interests. *Forrester v. Stockstill*, 869 S.W.2d 328, 334–35 (Tenn. 1994); *Thompson v. Memphis Light, Gas & Water*, 416 S.W.3d 402, 413 (Tenn. Ct. App. 2011). That's because a tortious interference claim requires three parties—the defendants must stand between the parties to the relationship. *Thompson*, 416 S.W.3d at 413. But if the defendants acted properly within the scope of their corporate capacity, their actions are a single act by a single corporation. *Trau-Med of Am. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703–04 (Tenn. 2002). Therefore, a plaintiff can overcome an intracorporate immunity defense by presenting evidence that the defendants "were acting outside the scope of their duties as officers of the corporation rather than on behalf of the corporation," essentially making the defendants a third party to the relationship between the plaintiff and the corporation. *Thompson*, 416 S.W.3d at 414 (quotation

omitted).  To do this, a plaintiff needs facts showing that the defendants "would benefit personally from [the plaintiff's] discharge."  *Id*. (quotation omitted).

The individual defendants argue that they fired Scott pursuant to their duties as Adroit board members and that Scott's termination was a proper corporate response to his takeover attempt.  Scott, on the other hand, failed to offer evidence that the individual defendants afforded themselves a personal benefit when they voted to fire him.  Scott did not reveal their alleged financial misdeeds in his capacity as an employee—indeed, his job was not related to the company's accounting.  He had access to the records as a corporate officer.  And he maintains that access even today.  Because Scott is a 20% owner of Adroit, Tennessee law affords him the right to inspect and copy records of Adroit transactions to make sure business is being properly conducted and to determine the value of his continuing ownership interest.  Tenn. Code Ann. § 48-26-102; *Daugherty v. Doyle*, No. M2013-02509-COA-R3-CV, 2014 WL 6453770, at *10 (Tenn. Ct. App. Nov. 17, 2014).  Because the individual defendants did not limit Scott's inspection rights by firing him, they also did not afford themselves a personal benefit in taking that action.

Scott's pre-termination conduct only bolsters the conclusion that the individual defendants did not personally benefit when they fired Scott.  By March 11, 2020, Scott had already reported the individual defendants to the IRS and provided the agency with access to documents.  So, the individual defendants did not protect themselves in firing Scott because the purportedly incriminating documents were already with the IRS.

Because we reject both of Scott's tortious interference claims, his civil conspiracy claim must also fail due to the absence of a viable underlying tort claim.  *ProductiveMD, LLC v. 4UMD, LLC*, 821 F.Supp.2d 955, 967 (M.D. Tenn. 2011) (quoting *Watson's Carpet & Floor Coverings v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007)).

## CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of Adroit Medical Systems, Inc., Grazyna Gammons, Kelley Patten, and Gene Gammons.

_____

**CONCURRENCE**

_____

THAPAR, Circuit Judge, concurring. I join the majority's thoughtful opinion. I write to emphasize two points.

The first is the importance of identifying the relevant timeline. Often in cases like this one, the time between the protected conduct and the adverse action is not that important. It's true, as the majority notes, that four days elapsed between Scott's protected activity and the defendants' decision to fire him. But they had no "meaningful opportunity" to fire Scott during those four days because they weren't Board members. *See Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 664–65 (6th Cir. 2020). And they fired him "immediately" upon regaining the ability to do so. *Cf. Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Moments are the relevant units of analysis here, not days.

To see why, change the facts slightly. Say the conservatorship proceedings took months to wrap up instead of a few days. Even though the temporal proximity between the protected conduct and the adverse action would've been several months, Scott still would've met his causation burden. That's because in each case, the Board fired him right after regaining the ability to do so. Knowledge of protected activity is inert without an accompanying ability to retaliate. So I agree with the majority that Scott can rely on temporal proximity alone to meet his burden. But in my view, the "proximity" here is mere moments, not days.

Second, I write to emphasize the fact-intensive nature of retaliation cases like this one. Because I believe the correct temporal proximity is mere moments, this is an easy, though "rare," case. The line won't often be this bright. As *Mickey* puts it, that line lies between "very close in time" (when temporal proximity alone is sufficient) and "some time" (when it's not). *Id.* I can't pinpoint the time at which "very close" becomes "some," and I don't understand the majority to be doing so. It suffices to say that as the gap in time increases, its value as circumstantial evidence decreases. And because the relevant gap here was minimal, its value as circumstantial evidence is maximal. So Scott can rely on it alone to meet his causation burden.

I acknowledge the difficulty in applying this blurry standard. A bright-line, good-for-all-cases rule would give clarity and predictability to litigants. And it would keep us from second-guessing district courts on what is essentially a judgment call—one on which reasonable minds might differ. For these types of judgment calls, we often apply deferential, abuse-of-discretion review. *Cf. Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 403–04 (1990) (applying a "unitary abuse-of-discretion standard" in the Rule 11 context to "fact-intensive, close calls" of law and fact); *accord United States v. Wilson*, 597 F.3d 353, 358 (6th Cir. 2010) ("[T]he fact intensive nature of this inquiry requires us to review the district court's ultimate decision for abuse of discretion."); *Cooper Indus. v. Leatherman Tool Grp.*, 532 U.S. 424, 443–44 (2001) (Scalia, J., concurring in the judgment) (explaining that abuse-of-discretion review is appropriate for issues "resistan[t] to meaningful generalization"); *Horne v. Flores*, 557 U.S. 433, 493–94 (2009) (Breyer, J., dissenting) (explaining that abuse-of-discretion review is particularly appropriate where "entitlement to relief depends heavily upon fact-related determinations"). But our precedent requires us to review the district court's decision de novo, which the majority properly does here.