**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 08a0640n.06**
**Filed: October 21, 2008**

**No. 07-3917**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **MARK T. RIDGLEY** | ) | ON APPEAL FROM THE U.S. |
| | ) | DEPARTMENT OF LABOR |
| *Petitioner-Appellant,* | ) | ADMINISTRATIVE REVIEW |
| | ) | BOARD |
| v. | ) | |
| | ) | **O P I N I O N** |
| **U.S. DEPARTMENT OF LABOR** | ) | |
| | ) | |
| *Respondent-Appellee.* | ) | |

BEFORE:     **COLE and GIBBONS, Circuit Judges; FORESTER, District Judge.**[*]

**COLE, Circuit Judge.**  Mark T. Ridgley seeks review of a decision of the Administrative Review Board ("Board") of the United States Department of Labor ("DOL") denying his complaint that he was fired from the C. J. Dannemiller Company (the "Company") in retaliation for making safety complaints about the Company's operations and trucks in violation of the employee-protection provisions of the Surface Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C. § 31105. The Board adopted the findings of a DOL Administrative Law Judge ("ALJ") that the Company terminated Ridgley solely for the legitimate, nondiscriminatory reason of insubordination. We **AFFIRM**.

---

[*] The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I.  BACKGROUND

### A.     Factual Background

The facts as found by the ALJ are undisputed.  The Company is a small, family-owned wholesale business in Norton, Ohio that sells roasted nuts, popcorn, and similar food products.  It has a facility for roasting nuts, and it ships its products to customers in its own fleet of trucks. Because it is engaged in commercial motor vehicle operations, the Company is subject to the STAA. James Dannemiller ("Dannemiller") is the Company's president.  All of the Company's employees are employed "at will," and according to Company policy, employees may be discharged for, among other things, insubordination or use of abusive language.

The Company hired Ridgley in 1991 to work in its nut-roasting facility and transferred him to a delivery-truck-driver position in 1998.  A delivery driver's duties include driving to customers' locations, unloading deliveries, and obtaining signatures on invoices.  Most delivery routes are within a 100-mile radius of the Company's warehouse and can be completed in eight to ten hours. Each driver has one route per week that extends beyond the 100-mile radius.  This longer route can usually be completed in a total of fifteen hours, with fewer than ten hours of actual driving-time. Ridgley's longer route took place on Tuesdays, and to complete it, he typically worked two to five hours of overtime, out of a maximum permissible amount of seven hours of overtime, in addition to his regular eight-hour shift.

Ridgley has a history of complaining about work assignments and of difficulty getting along with co-workers, who described him as moody, having a poor attitude, and hostile.  In response to Ridgley's complaints, Dannemiller sometimes removed stops from Ridgley's routes and gave them

to other drivers. Ridgley also expressed a desire not to work past 4:00 p.m. on Mondays due to his long Tuesday route, and the Company generally accommodated him.

While employed as a driver, Ridgley made several specific complaints about truck safety and lawful work hours. Although the Company's trucks occasionally required repair, the ALJ found that the Company had an excellent safety record, serviced its trucks regularly, and did not allow trucks with serious safety defects to operate. The Company took prompt action to make necessary repairs, and no driver has ever been cited for operating an overweight truck.

On Monday, December 1, 2003, Ridgley arrived at work at 8:15 a.m. and reviewed his trip assignment, which had been scheduled by the Company dispatcher the day before. The route had a total of twelve stops—two or three more than usual—because it was a holiday delivery. Ridgley was concerned that the trip would take fourteen to sixteen hours, which would make him fatigued for his long Tuesday route. Ridgley sought out Dannemiller and stated, "I told you I don't want to work after 4:00 PM—this is a bigger trip than normal." (Joint Appendix ("JA") 11.) According to Dannemiller, Ridgley did not expressly state that he was concerned about either safety or exceeding the maximum hours permitted by Department of Transportation regulations; rather, he merely insisted that he did not want to work past 4:00 p.m. The ALJ found that Ridgley had completed his Monday route approximately 150 times without once exceeding permissible time limits set by the Department of Transportation. Nonetheless, when Ridgley asked for a helper for the route, Dannemiller attempted to accommodate him but determined that no helper was available. Dannemiller also decided it was not feasible to remove certain stops from Ridgley's assigned route because the products for those stops had been loaded in the nose of the truck and were inaccessible.

Dannemiller concluded there was no other available assignment for Ridgely that day, so he assigned Ridgley's route to a substitute driver and sent Ridgley home. Dannemiller told Ridgley to call if he did not plan to drive his Tuesday route the following day. The substitute driver to whom Ridgley's Monday route was assigned completed it in eight hours and twenty minutes, concluding at 4:35 p.m.

Dannemiller called Ridgley on Monday evening around 5:00 p.m. to confirm that Ridgley would be in the next day to complete his Tuesday route. Ridgley did not answer, so Dannemiller left the following voice message on his answering machine:

> Mark, This is Jim. I was wondering if you were going to be able to make it tomorrow. It's a little before 5:00. We are loading the truck. Incidentally it's been back since a quarter of. It took 8 hours and 20 minutes to make that all day and all night trip today. So it wasn't quite as bad as it appeared I guess this morning. So we're loading it, we're putting it in #10. So if you are able to handle it, let me know. Otherwise, Will will be taking off at about 6 in the morning.

(JA 231.) The ALJ found that Dannemiller's tone of voice on the message was calm and patient.

When Ridgley returned Dannemiller's call later that evening, he asked Dannemiller whether he had removed any stops from the Monday route for the substitute driver. Dannemiller replied that he had not. Ridgley stated either, "I don't believe it," or that he found that "hard to believe," to which Dannemiller replied, "are you calling me a liar?" (JA 12.) When Ridgley replied, "[y]es, and you've been lying to me for years," Dannemiller became angry and told Ridgley there was no need for him to return to work because "he was finished." (*Id.*) Ridgley replied, "[y]ou're finished too," which Dannemiller took as a possible threat. (*Id.*)

Ridgley and Dannemiller met the next day, at which point Ridgley claims he asked if he could keep his job. Dannemiller replied that Ridgley's termination was final, but that Ridgley would

be paid through the holidays. Dannemiller testified that he was sorry about the way things ended and that he offered to let the Company's records reflect that Ridgley was laid off rather than fired so that Ridgley would be eligible for unemployment benefits.

**B.      Procedural Background**

Several months after he was discharged, Ridgley filed a complaint of discrimination with the DOL, alleging that he was fired by the Company in retaliation for making safety complaints about the Company's operations and trucks, in violation of the STAA. The Occupational Safety and Health Administration ("OSHA") of the DOL investigated Ridgley's complaint, found it without merit, and dismissed it. Ridgley objected to OSHA's findings and requested a hearing. The matter was tried before an ALJ, who found that the Company had discharged Ridgley for a legitimate, nondiscriminatory reason—insubordination—and that Ridgley's termination was not causally related to any protected activity under, nor a violation of, the STAA. The Board accepted the ALJ's recommendation and denied Ridgley's complaint. Ridgley timely filed a petition for review in this Court.

## II.  ANALYSIS

**A.      Standard of Review**

We review the Board's decision under the STAA applying the substantial evidence test, which requires us to uphold the decision if it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We "may not relitigate the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Moon*,

836 F.2d at 229. We must uphold the Board's legal conclusions "unless they are arbitrary, capricious, involve an abuse of discretion, or otherwise are not in accordance with law." *Yellow Freight Sys., Inc. v. Reich*, 27 F.3d 1133, 1138 (6th Cir. 1994) (quoting *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992)).

**B.      Merits**

Section 405(a)(1)(A) of the STAA makes it unlawful to discharge, discipline, or discriminate against an employee for filing a complaint alleging violation of applicable commercial motor vehicle safety regulations, including an internal safety complaint made to an employer. 49 U.S.C. § 31105(a)(1)(A).[1] This provision "was enacted in 1983 to encourage employee reporting of noncompliance with safety regulations governing commercial motor vehicles." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258 (1987). "Congress recognized that employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for cooperating with enforcement agencies, they need express protection against retaliation for reporting these violations." *Id*.

We analyze STAA whistle-blowing claims using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Moon*, 836 F.2d at 229. Under this standard,

> the plaintiff has the initial burden of establishing a prima facie case of retaliatory discharge. Once a prima facie case is established, one which raises an inference that protected activity was the likely reason for the adverse action, the burden of

------

[1] The STAA was amended in 2007, after the relevant actions in this case, and this subsection is now codified as § 31105(a)(1)(A)(i).

production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. If the defendant is successful in rebutting the inference of retaliation, the plaintiff bears the ultimate burden of demonstrating by a preponderance of the evidence that the legitimate reasons were a pretext for discrimination.

*Id*. To establish a prima facie case, Ridgley must adduce evidence establishing that: (1) he engaged in protected activity under the STAA; (2) the employer had knowledge of his protected conduct; (3) he was the subject of an adverse employment action; and (4) there was a causal link between his protected activity and the adverse action of his employer. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

Ridgley established the first three elements. He made numerous safety-related complaints to Dannemiller regarding the condition of the Company's trucks and about working conditions. With respect to Ridgley's complaint on the morning of Monday, December 1, 2003 about the length of his route that day, the ALJ found that a safety concern related to working conditions could be inferred from Ridgley's comments, making the complaint protected activity under the STAA, despite the fact that Ridgley's complaint "centered on" his desire to avoid performing extra work assignments, (JA 18), a matter that does not come under the protection of the STAA. We similarly conclude that Ridgley's comments during the phone conversation in which he was terminated were related to a safety concern, since they dealt with whether Dannemiller was telling the truth about the length of the Monday route. Dannemiller was aware of Ridgley's protected conduct, and Ridgley was the subject of an adverse employment action when he was discharged. The final element—whether a causal link existed between Ridgley's safety complaints and his discharge—requires further analysis.

The ALJ concluded that, at the prima facie stage, Ridgley satisfied the causation element by establishing the proximity in time between his initial complaint about the Monday route (Monday morning) and his termination (Monday evening). We need not reach the question of whether temporal proximity alone can be sufficient evidence of causation because the parties do not dispute that Ridgley was terminated for an insubordinate comment, nor is there any dispute that this comment was related to his earlier complaint about the length of his Monday route. At the prima facie stage, this is sufficient to meet Ridgley's burden on causation.

Once a prima facie case is established, the burden of production shifts to the Company to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. To meet its burden of production, a defendant "need not persuade the court that it was actually motivated by the proffered reasons . . . [but] must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981) (citation and footnotes omitted). Dannemiller's testimony that he terminated Ridgley solely for insubordination satisfied this burden.

The employer's proffered legitimate reason for the termination rebuts the presumption raised by the prima facie case, and Ridgley must then carry his ultimate burden of persuasion to show that he was terminated in retaliation for raising safety concerns. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993). Substantial evidence supports the conclusions of the ALJ and the Board that Ridgley did not meet this burden. The record shows that Ridgley was not discharged because he raised safety concerns but because he accused Dannemiller of being a liar.

First, when Ridgley initially complained about the length of the Monday, December 1, 2003 route, Dannemiller took no adverse employment action against him. On the contrary, Dannemiller tried to obtain a helper for Ridgley and considered whether some of Ridgley's stops could be eliminated. After Dannemiller determined that neither of these options was feasible, he did not attempt to force Ridgley to drive but assigned the route to a substitute driver and sent Ridgley home without indicating that Ridgley would be disciplined in any way.

Second, Ridgley had previously complained about his workload and refused trips without being disciplined. The Company's willingness to accommodate Ridgley, without penalty, on numerous occasions, including when he complained about the length of his Monday, December 1, 2003 route, shows that the Company intended to retain Ridgley, not retaliate against him for complaining about his assignment.

Third, after Ridgley complained about the Monday route and it was reassigned to a substitute driver, Dannemiller actively sought Ridgley's services for the next day. Dannemiller's message on Ridgley's telephone answering machine shows that Dannemiller expected and desired Ridgley to work on Tuesday and had no intention of firing him. The ALJ found that the taped message "does not show an employer on the verge of firing an employee; in fact, it is just the opposite." (JA 6.) The ALJ found that Dannemiller's statement in the message about the length of time in which the substitute driver had completed the route was simply meant to inform Ridgley that Ridgley had overestimated the length of the route. The ALJ, who listened to Dannemiller's message, found that Dannemiller did not imply that Ridgley should have driven the Monday route or that Ridgley would be penalized for failing to do so.

Fourth, there was substantial evidence, as the ALJ determined, that Ridgley's complaint about his Monday route was motivated in part by his desire to avoid performing extra work, making it less likely that Ridgley was terminated in retaliation for raising safety concerns.

Fifth, the ALJ found that it was not in the Company's interest to terminate Ridgley during its busiest time of year, making it unlikely that Ridgley's complaint regarding his route was the basis for his termination.

There was also substantial evidence for the ALJ's determination that the Company would have continued to accommodate and address Ridgley's complaints if he had not made insubordinate remarks to Dannemiller. The ALJ found Dannemiller to have been "ever-patient" with Ridgley and to have been "convincing" in stating that he would not have fired Ridgley if Ridgley had not called him a liar. (JA 6.) Dannemiller's motivation for terminating Ridgley's employment is a question of fact, and the ALJ's factual determinations are supported by substantial evidence.

Ridgley argues that because he was fired for a comment made during a conversation about the length of his Monday route, he was necessarily retaliated against. But "an employer may terminate an employee who behaves inappropriately, even if that behavior relates to a legitimate safety concern," *Am. Nuclear Res., Inc. v. U.S. Dept. of Labor*, 134 F.3d 1292, 1295 (6th Cir. 1998), as long as the termination is not *because* of the safety complaint. Ridgley claims he was fired "for challenging the employer's honesty *about safety compliance*," (Appellant's Reply Br. 2 (emphasis added)), but the ALJ found that the termination was motivated solely by the accusation of dishonesty, not by the fact that the accusation was related to the length of Ridgley's route. Similarly, Ridgley argues that he had "the right to speak out when his employer [used] deception to break

- 10 -

trucking safety laws" and states that "the *lying employer* cannot ask, on a question of compliance with motor carrier laws, 'Are you calling me a liar', and then fire an employer for saying, 'Yes.'" (*Id*. at 4 (emphasis added).) These arguments presuppose facts that the ALJ found did not exist: that Dannemiller used deception to break trucking safety laws and that he lied to Ridgley.

Ridgley relies on *Kenneway v. Matlack, Inc.*, No. 88-STA-20, 1989 DOL Sec. Labor LEXIS 47, at *7-8 (Sec'y of Dep't of Labor June 15, 1989), which held that the STAA provides some leeway for impulsive behavior, including insubordination, in connection with a protected safety complaint. By its own terms, *Kenneway* stated that "[t]he issue of whether an employee's actions are indefensible under the circumstances turns on the distinctive facts of the case," *Id.* at *8, and the ALJ convincingly distinguished the facts at issue here. The complainant in *Kenneway* was terminated for refusing to perform an assignment that would have caused him to violate a Federal Motor Carrier Safety Regulation, while Ridgley was accommodated when he expressed a desire not to drive his Monday route and was never asked to violate any commercial vehicle regulation. The ALJ was well-supported in concluding that circumstances of Ridgley's termination did not entitle him to the impulsive behavior protections discussed in *Kenneway*.

Ridgley is not entitled to a mixed-motive analysis. "If an employer retaliates for both legitimate and illegitimate reasons, courts apply the 'dual motive' test, under which the employer must show that it would have retaliated even if the protected activity had not occurred." *Am. Nuclear Res.*, 134 F.3d at 1295. "The employer bears the risk if the two motives prove inseparable." *Id*. Because the ALJ found that retaliation was not even a partial motivating factor, the mixed-motive analysis is inapplicable. Ridgley's reliance on *Pogue v. United States Department of Labor*,

940 F.2d 1287 (9th Cir. 1991), is misplaced because the employer in that case conceded that it had

been partially motivated by illegal factors.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the Board.